IN THE MATTER OF THE APPLICATION OF JESSE JENKINS
FOR ADMISSION TO THE BAR OF NEW JERSEY.

Argued September 12, 1983—Decided November 10, 1983.

*Barry H. Evenchick* argued the cause for Jesse Jenkins (*Barry H. Evenchick,* attorney; *Barry H. Evenchick* and *A. Richard Ross,* on the briefs).

*Colette A. Coolbaugh,* Assistant Director, argued the cause for Division of Ethics and Professional Services (*Colette A. Coolbaugh,* attorney; *Harold L. Rubenstein,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Here we determine the fitness to practice law of Jesse Jenkins, a candidate for admission to the bar, who failed to disclose to the Committee on Character that he had been arrested and charged in at least three criminal actions, and had been a party in numerous civil actions. In fact, Jesse Jenkins submitted two certified statements in which he denied the existence of these criminal and civil actions. Even after the Board of Bar Examiners permitted Jenkins to file a third certified statement, as if he were applying for admission anew and at a time when both he and the Board were aware of his prior nondisclosures, he still failed to disclose one of these arrests.

Initially, Part II, a subcommittee of the Committee on Character (Committee), concluded Jenkins was not fit to practice

law, a conclusion the entire Committee affirmed. After a third certified statement and additional hearings, the Committee concluded that Jenkins was truly remorseful for not disclosing his prior criminal arrests and the civil actions in which he was involved. Because of Jenkins' changed attitude and the long delay in his admission to the bar, the Committee certified Jenkins' fitness to practice law and recommended his admission to the Bar. The Board of Bar Examiners (Board) agreed and recommended that we accept the Committee's certification. We disagree, reverse the Committee's certification, and find that Jenkins is not now fit to practice law.

I

On October 11, 1973, Jesse Jenkins was arrested for larceny of an auto and possession of burglary tools. According to the report of the arresting officer, Jenkins was found on the floor of a new Buick with the burglary tools. The Buick was parked on the lot of a Buick dealer. During the same year, he was involved in a civil suit in which he admitted paternity of a son born out of wedlock.

In June 1976, Jenkins was arrested for, and charged with, embezzlement. These charges arose from Jenkins' CETA employment as a trainee-claims examiner with the New Jersey Unemployment Security Office in North Newark, New Jersey. Jenkins allegedly forged four pay orders upon which four fictitious unemployment benefit checks were issued. The embezzlement charges were dismissed by the Municipal Court of Newark after the State Police handwriting expert failed to testify and a participant in the illegal transaction could not be located. The same incident resulted in forgery charges in 1978, which were dismissed after Jenkins' successful completion of Pretrial Intervention Program (PTI) and restitution of $180.00, the amount allegedly obtained. Nevertheless, the Prosecutor's Office, realizing that Jenkins was to be graduated from law school, advised

the Committee in September, 1978 of the then pending forgery charges.

Between 1976 and 1978, Jesse Jenkins was involved in three other civil actions: (1) a 1976 and 1977 suit in which he successfully opposed termination of his parental rights and the adoption of his son by a stepfather; (2) a 1977 suit in which he was a defendant in a hearing concerning visitation and support of that child; and (3) a 1978 suit in which his fiance sued for injuries she sustained while a passenger in a car he was driving.

## II

In January 1979, Jesse Jenkins was graduated from law school. He took the New Jersey bar examination twice, passing the July 1979 examination. As part of the admission process, Jenkins submitted two certified statements, dated December 10, 1978 and May 23, 1979, respectively, to the Committee. In both of his certified statements, despite his previous arrests, Jenkins answered "No" to Question X, Part B:

Have you ever been charged with, arrested for, or convicted of the violation of any law (other than minor traffic offenses)? The entry of an expungement or sealing order does not relieve you of the duty to disclose the matter on this statement. You may, however, indicate below the existence of such order.

He also answered "No" on both certified statements to Question X, Part A:

Have you, in your individual capacity, ever been a party to, or claimed any interest in, any civil proceeding?

After Jenkins passed the examination, the Committee commenced an investigation to determine his fitness to be admitted to the bar. That investigation included a review of the certified statements.

Due to Jenkins' failure to disclose the criminal arrests, Part II of the Committee held an informal hearing on January 31, 1980. At the hearing, Jenkins claimed he did not disclose the forgery and embezzlement arrests because he was not guilty of any criminal conduct. Further, he claimed the Public Defender advised him that admittance to the PTI program "would render

the matter void ab initio" and he would not have to disclose the matter in the future. He did not mention the 1973 arrest.

After the hearing, a member of the Part II Committee contacted the Public Defender. He denied giving this advice. In its report, the Part II Committee noted that Question X, Part B requires disclosure even if an expungement or sealing order has been entered. As Jenkins had not completed the PTI program when he filed his statement, the Committee noted any possible benefits of PTI participation had not yet accrued to him and that even if Jenkins' position was correct, participation in the PTI program would affect the 1978 arrest only.

At the January 1980 informal hearing, the Part II Committee also questioned Jenkins about his "No" answers to Question X, Part A. Jenkins admitted his participation in the suits involving his son and in the automobile negligence suit. He explained his failure to disclose his involvement in these matters by saying that he did not realize these various court proceedings were civil in nature and he did not believe that the Committee could investigate aspects of his personal life.

The Part II Committee then asked if there were any other civil actions to which Jenkins was a party. He said there were none; but prior to a formal hearing, Jenkins disclosed that he was involved in four additional civil actions: (1) as a defendant in Municipal Court for violation of *N.J.S.A.* 4:22–22 (possession of a diseased animal); (2) as a defendant in a tenancy complaint; (3) as a defendant in Superior Court in a suit for insurance proceeds; and (4) as Administrator in a survival action and as next of kin in a wrongful death action of his brother, Thomas.

The Part II Committee next asked Jenkins to explain a discrepancy in his employment history. In his 1978 certified statement, Jenkins claimed his job with the Unemployment Security Office ended because of absenteeism, but in his 1979 certified statement he claimed his job ended because of his return to law school. Jenkins insisted that the Division's official

record listed absenteeism as the reason for termination even though the agency simply wanted to be rid of him due to the suspicion of embezzlement. He therefore felt that the deception justified his giving another reason.

Finally, the Part II Committee questioned an inconsistency between his employment history and an Affidavit filed with the Office of the Public Defender. In his certified statements, Jenkins stated that he was employed by the Newark Tenants Council from July 1978 through December 10, 1978, the date of the first statement. In his Affidavit seeking the assistance of the Public Defender in the forgery matter, he claimed he was eligible for representation because he was unemployed during this period. Subsequently, the Newark Tenants Council advised the Committee that Jenkins was employed by the Council in July 1978 but was on leave of absence from that agency from August 21, 1978 to October 2, 1978.

Part II of the Committee found Jenkins' explanations totally unsatisfactory, stating:

> It is the conclusion of this Committee that Jesse Jenkins deliberately failed to disclose the incidents of criminal charges against him and his participation in civil litigations, all for reasons best known to himself. Statements made at the informal conference lead to the conclusion that this applicant perceives an obligation to disclose only that information which he deems necessary and appropriate for the Committee to receive. Furthermore, it is the Committee's conclusion that the applicant was less than frank and honest in his response to the question regarding termination of employment with the Division of Unemployment and in his affidavit seeking assignment of the Public Defender in his case.

> For the foregoing reasons, the members of Part II conclude that the applicant is not fit to practice law in New Jersey. ["Summary of Findings and Recommendations Pursuant to Rule VII," March 4, 1980, at 10.]

Jenkins appealed this decision by seeking a formal hearing before the full Committee. At that formal hearing on June 25, 1980, the Committee questioned Jenkins about his answers to Question X, Parts A & B, the discrepancy in his employment history and the inconsistencies in his employment history and the Affidavit filed with the Public Defender.

The full Committee categorically rejected each of Jenkins' putative explanations for failing candidly to disclose the omissions and discrepancies in his certified statements. It found that his failure to disclose the criminal charges in both the embezzlement and forgery matters, the various civil proceedings concerning his son, and the grounds of his employment termination from the State were intended to conceal these from the Committee. Further, the full Committee concluded that Jenkins had negligently failed to disclose the other matters it considered, which adversely reflected on his ability to practice law. The full Committee voted against Certification.

Jenkins then appealed to the Board, which reviewed the transcripts and reports of both Part II and the full Committee and interviewed Jenkins. In its report, the Board stated that it
unanimously agreed with the concerns, observations and conclusions of fact and law expressed by the Committee on Character in its report. ["Report and Recommendation of the Board of Bar Examiners," May 5, 1981, at 2.]

Nevertheless, after interviewing Jenkins, the Board concluded that Jenkins'
conduct at this interview demonstrated a substantial positive shift from his position at the Committee hearing, as interpreted by us from reading the transcript. At the outset, he frankly expressed his regret for the manner in which he completed his application. He said he learned an important, but painful, lesson as a result of this experience and he fully realizes now that he should have made complete disclosure of all matters on his application; he should not have made such a technical interpretation of the questions and should have resolved any doubts in favor of making full disclosure. He emphasized that this is what he would do if faced with such a situation in the future, and as a lawyer, this is how he would advise a client. [Id. at 3.]

The Board, impressed with Jenkins' attitude and aware that a year and a half had elapsed since his scheduled admission to the bar, permitted Jenkins to file a third certified statement as if he were applying for admission anew. In May of 1981 the Board recommended Jenkins' admission to the bar.

This Court considered the Board's recommendation and remanded the matter to the full Committee for further proceedings to investigate the merits of the criminal charges filed

against the applicant and the civil litigation involving the applicant. This remand resulted in a second formal hearing.

At that hearing, Jenkins acknowledged that he had been wrong not to make full disclosure of the 1976 and 1978 arrests and his involvement in the civil litigation. (He still did not disclose the 1973 arrest however.) The Committee found this attitude to be a "significant departure" from the one adopted earlier. Thus, while the full Committee specifically stated that it did not retract any of its 1980 report, it found that Jenkins' new attitude demonstrated a fitness to practice law, and recommended his admission.

The Board reviewed the report of the Committee. Three members of the Board voted to accept the conclusions contained therein, with one member opposed and one abstaining. The Board then forwarded the recommendations to this Court.

The Court ordered a temporary remand to the Committee on October 1, 1982 to investigate Jenkins' employment with the North Newark Unemployment Security Office, and the circumstances surrounding the criminal charges of embezzlement and forgery, including later pretrial diversion. At the Court's request, an investigator, Irving Dubow, from the Division of Criminal Justice was assigned to assist the Committee in its investigation. The Dubow Report provided a synopsis of various interviews Dubow had conducted with employees at the North Newark Office, and with Osiris Ruiz, a participant in the fraudulent scheme, who now was located but had not been available to the Essex County Prosecutor. These interviews, plus analysis of Jenkins' handwriting samples by the State Police, led Dubow to conclude that Jenkins was a principal in the scheme. The report also disclosed the 1973 arrest for the first time.

Jenkins received the Dubow Report. He filed exceptions and an Affidavit in response to the report. In his Affidavit, he stated:

Upon receipt of Mr. Dubow's report, I was reminded of my arrest in 1973, the charges lodged against me and the dismissal of the charges by the East Orange

Municipal Court. Before receiving Mr. Dubow's report, I did not have an independent recollection of the 1973 arrest and charges.

\* \* \* \* \* \* \* \*

I failed to bring the 1973 East Orange matter to the attention of the Committee. My failure to do so was not motivated by any attempt to conceal this matter. ["Affidavit of Jesse Jenkins," May 25, 1983, par. 7, 9.]

His description of the incident in that Affidavit was very different from the arresting officer's report. Jenkins stated:

I was a young man and interested in cars. I was looking at new cars on the lot of a dealer and sat in one of them behind the steering wheel. I was arrested, but I did not intend to do anything wrong. The judge dismissed the matter. I simply forgot about the matter, and I regret not having remembered it before receiving Mr. Dubow's report. [Id., par. 11.]

Dubow also disclosed for the first time in his report that in 1973 Jenkins had received four motor vehicle violations, and that contempt of court citations and warrants for his arrest had been issued in connection with them.

With respect to these violations, Jenkins' Affidavit states:

I also am aware of the four parking violations listed in Mr. Dubow's report. I paid these matters in full in 1973. I was not arrested on these matters. After I paid these violations I was stopped by the Newark police who asserted that these were outstanding violations. Upon further inquiry by the police, they determined that these matters had been paid. [Id., par. 12.]

Upon receipt of Jenkins' exceptions to Dubow's report, we issued an order to show cause to review the Committee's certification of Jenkins' fitness to practice and to determine whether he should be admitted to practice law. R. 1:25.

III

The crux of this case is the fitness to practice law of a bar applicant who continuously displays a lack of candor to the Committee and the Board. The New Jersey Constitution entrusts to the Supreme Court the power to determine standards for admission to the bar. N.J. Const. (1947) Art. VI, § 2, ¶ 3. As a requirement for admission, all applicants must obtain a certification of "good character," R. 1:27–2, by demonstrating that they have the requisite "fitness to practice law." R. 1:25.

This moral fitness requirement has been the rule in New Jersey for well over a century, *Re Application for Attorney's Licensing,* 21 *N.J.L.* 345 (1848), and has been consistently reaffirmed by the Court. Recently, in *In re Matthews,* 94 *N.J.* 59, 75–78 (1983), we examined in great detail the standards for evaluating the fitness of a bar applicant to practice law. We surveyed a number of definitions of good moral character, a universal requirement, that other courts have adopted. Although the definitions differ slightly, they all identify truthfulness, honesty, and candor as necessary characteristics for establishing a candidate's good moral character and hence his or her fitness to practice law. We determined that the fitness requirement for all lawyers be formulated in terms of the qualities of character attorneys must possess to fulfill their obligations to individual clients and to the judicial process. *Matthews, supra,* 94 *N.J.* at 77.

Accordingly, we conclude that a bar applicant must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice. These personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly. We also believe that applicants must demonstrate through the possession of such qualities of character the ability to adhere to the Disciplinary Rules governing the conduct of attorneys. These Rules embody basic ethical and professional precepts; they are fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of the court. These Rules reflect decades of tradition, experience and continuous careful consideration of the essential and indispensable ingredients that constitute the professional responsibility of attorneys. Adherence to these Rules is absolutely demanded of all members of the Bar. [*Id.* at 77–78.]

## IV

█ We now examine whether and to what extent Jenkins' conduct demonstrates a present unfitness to practice law. Unless evidence of unfitness is clear and convincing, any lingering doubts are resolved in favor of the applicant and his or her admission to the bar. *In re Matthews, supra,* 94 *N.J.* at 78; *In re Shaw,* 88 *N.J.* 433, 437 (1982).

The heart of Jenkins' misconduct is not his possible involvement in embezzlement, forgery, or larceny. Given the lapse of time, it is impossible to determine the truth of these charges. We are concerned therefore solely with Jenkins complete and continuous lack of candor to the Committee and the Board.

 Throughout the admission process Jenkins displayed a consistent pattern of untruthfulness. Jenkins' failure to disclose his criminal arrests and his civil actions and his misstatements concerning his employment record all reveal the same design. In each case, he denies the adverse event occurred. Confronted with evidence to the contrary, he offers an inadequate and unplausible excuse for not disclosing the incident. Finally, he displays contrition. The pattern is clear and unequivocal.

We do not accept Jenkins' explanations. Like the Committee and the Board, we accept the conclusions in the full Committee's 1980 report, which stated:

The Committee finds that Jenkins failed to disclose the criminal charges filed against him in the Newark Municipal Court in May of 1976, with the purpose of concealing this charge from the Committee. His explanation that he did not believe that he had to list the charge, since it had been dismissed for lack of probable cause, is rejected. The question on the application clearly asks for charges as well as convictions to be listed.

The Committee finds that Jesse Jenkins failed to disclose the criminal charges filed against him in the Essex County Court with an intent to conceal this information from the Committee. The Committee rejects as untrue his explanation that the Public Defender who represented him advised him that he need not provide this information because to require disclosure would be contrary to the policy of the case of State v. Leonardes [Leonardis] 71 N.J. 85 (1976).

\* \* \* \* \* \* \* \*

The Committee finds that Jesse Jenkins failed to disclose the paternity proceeding in which he was involved, as well as the subsequent proceeding involving his opposition to the termination of his parental rights, for a purpose to conceal this information from the Committee. The Committee rejects as untrue his explanation that he did not believe that those proceedings were civil.

The Committee finds that Jesse Jenkins falsely supplied the answer that his employment had been terminated with the State in order to return to school, with a purpose of concealing the fact that the State had terminated his employment either because of excessive absenteeism or because of an alleged embezzlement.

Jesse Jenkins' purpose in concealing this information was to keep from the Committee materials that might adversely affect his character.

 \* \* \* \* \* \* \* \*

We further find that Jesse Jenkins either did know, or should have know, that the Public Defender would be misled by the failure to indicate that he was on a leave of absence from his employment, and should have supplied them with this information. ["Committee Report," June 25, 1980 at 3–5.]

Of course, the Committee had no knowledge of the 1973 arrest. We conclude that Jenkins' failure to disclose his 1973 arrest was for the purpose of concealing the charge from the Committee and later the Board. We view with great skepticism his explanation that he simply forgot the arrest. For the last four years, he has been denied admission to the bar because of his lack of candor in failing to disclose his criminal arrests and the civil actions in which he was a party. Jenkins' lapse of memory becomes even more unconvincing when he sets forth a current recollection of the incident that differs substantially from the arresting officer's report.

His failure to disclose the 1973 arrest to the Committee or the Board or to report the arrest on his third certified statement is particularly significant. The Committee and the Board based their revised recommendations that Jenkins was fit to practice law solely on their belief that Jenkins had changed his attitude and now understood the importance of truthfulness. This belief was gleaned from their examination of Jenkins' supposedly "accurate and complete" third statement and his later appearances before them. After an interview with him, the Board wrote:

At the outset, he frankly expressed his regret for the manner in which he completed his application. He said he learned an important, but painful, lesson as a result of this experience and he fully realizes now that he should have made complete disclosure of all matters on his application; he should not have made such a technical interpretation of the questions, and should have resolved any doubts in favor of making full disclosure. He emphasized that this is what he would do if faced with such a situation in the future and, as a lawyer, this is how he would advise a client. ["Report and Recommendation of the Board of Bar Examiners," May 5, 1981, at 3.]

After the subsequent remand by the Supreme Court, the Committee on Character held another hearing. The Committee then reported that "[t]hroughout the hearing, Mr. Jenkins did manifest a realization that he had indeed been seriously delinquent in his duty to make full disclosure in his initial application for admission to the Bar." "Committee Report—On Remand," April 7, 1982, at 2–3.

Jenkins' failure to disclose the 1973 arrest demonstrates that the Committee's and Board's beliefs were erroneous. Jenkins still does not understand the importance of candor.

We believe that Jenkins' pattern of nondisclosure evidences a serious lack of fitness to practice law. Jenkins' actions go to the integrity of the admission system. If a candidate conceals the truth or misleads the Committee concerning events in his past that adversely affect his character, the process for reviewing candidates will collapse and no purpose will be served. The purpose of withholding certifications is not to punish the candidate but to protect the public and preserve the integrity of the Courts. *See In re Matthews, supra,* 94 *N.J.* at 76–77; *In re Herr,* 22 *N.J.* 276, 301 (1956). We have long and firmly held that "there is no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved. In the legal profession, there must be a reverence for the truth." *In re Hyra,* 15 *N.J.* 252, 254 (1954).

In sum, we conclude that Jenkins' failure to disclose his criminal arrests and his numerous civil actions, together with his misstatements concerning his employment, demonstrate his unfitness to practice law. *R.* 1:25; *R.* 1:27–1(a)(2). Jenkins lacks the required character traits of honesty and truthfulness, trustworthiness and reliability required of an attorney admitted to practice law in New Jersey.

## V

A fundamental rule in bar admission cases is that evidence of reform and rehabilitation is relevant to determine

an applicant's present fitness to practice law. If an applicant's behavior subsequent to the disqualifying misconduct convincingly demonstrates rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct, and if persuasive, it may support a finding of present fitness. *In re Matthews, supra,* 94 *N.J.* at 81. In *Matthews,* we listed a variety of types of evidence that have been found probative of reform and rehabilitation. One particularly relevant type is candor before the Committee. "In all instances, the applicant must display complete candor in all filings and proceedings required by the Committee on Character. Courts will weigh heavily the applicant's attitude as expressed in hearings before the Board of Bar Examiners and any reviewing courts." *Id.* at 82. Another relevant factor is the absence of misconduct over a period of intervening years.

Jenkins' actions, particularly his failure to disclose his 1973 arrest as recently as December 1982, demonstrate that he still does not possess the character traits of truthfulness and honesty that are the fundamental elements for admission to practice. It is clear that he is not rehabilitated. While he appeared remorseful before the Committee and the Board and expressed an understanding that he should have made full disclosure and would do so in the future, his failure to disclose his 1973 arrest and his explanation of his failure amply demonstrate that he still does not understand the necessity of telling the truth.

We recognize that four years have passed since he passed the bar, that Jenkins paid restitution to the victim, and that some professors from his law school have written letters in his support. Nevertheless, we here are faced with not only past but continuing misconduct. We see nothing in the record to suggest that Jenkins will be more truthful in the future than at present. We see no evidence that he understands the wrongfulness of his actions. In sum, he does not yet "stand free from all suspicions" as is required of an attorney. *Matthews, supra,* 94 *N.J.* at 81. For the present, it is clear he has not established that he is fit to practice law.

Whether Jenkins will ever be rehabilitated we do not know. Certainly, for Jenkins it will be extraordinarily difficult to overcome the strong presumption of continuing unfitness to practice law occasioned by his persistent lack of candor. Nevertheless, we do not wish to foreclose the possibility that at some time in the future, Jenkins may be able to produce sufficient evidence of the character traits necessary to establish his fitness to practice law.

Accordingly, we reverse the Committee's certification of fitness to practice, without prejudice to the applicant's right to present to the Committee additional evidence concerning his rehabilitation in accordance with the standards set forth in *In re Matthews, supra,* 94 *N.J.* at 82–83.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.