675 A.2d 1101

IN THE MATTER OF THE APPLICATION OF FRANK
B. MCLAUGHLIN, FOR ADMISSION TO THE
BAR OF NEW JERSEY.

Argued November 28, 1995—Decided May 20, 1996.

*Thomas J. McCormick*, Assistant Ethics Counsel, argued the cause on behalf of the Committee on Character.

*Philip A. Nemecek*, a member of the New York bar, argued the cause on behalf of respondent (*Andrew B. Lane*, attorney; *Frank B. McLaughlin*, pro se, on the brief).

The opinion of the court was delivered by

HANDLER, J.

This is a bar-admissions case. It arises from the report and recommendation of the Supreme Court Committee on Character that the required certification of good character be withheld from a candidate for the July 1994 New Jersey Bar Examination. The recommendation was based on the Committee's conclusion that the candidate did not demonstrate the fitness and good character essential for the practice of law.

The case requires the Court to explain the standards for evaluating character and fitness for the practice of law, and to reemphasize the importance of these requisites for admission to the bar. More specifically, the Court must address truthfulness and respect for the administration of justice as traits of character and fitness that are deemed indispensable to a lawyer.

I

Frank B. McLaughlin sat for the July 1994 New Jersey Bar Exam. Mr. McLaughlin ("McLaughlin" or "candidate") was a graduate of Rutgers Law School–Newark where he was Book Review Editor of the Rutgers Law Review. Before attending law school, McLaughlin was a claims analyst for American Reinsurance in Princeton, New Jersey, from October 1988 to Septem-

ber 1991. Following his graduation from law school, he completed and submitted his application to sit for the July exam on May 29, 1994. His application was reviewed in normal course. A routine fingerprint check revealed a prior arrest that was apparently not disclosed in McLaughlin's application. The Committee on Character, established under *Rule* 1:25 to assess the character qualifications of candidates for admission to the bar, reviewed the candidate's application in an informal conference pursuant to Regulation 303 of the Regulations Governing the Committee on Character (*RG* 303). Although the Court has determined that the July 1991 version of the Regulations should be applied to McLaughlin's application, references will be made herein to more current Regulations.

On August 25, 1995, the hearing panel of the Committee issued its report recommending that the Court withhold the character certification of McLaughlin. Its recommendation was based on a pattern of lack of candor exhibited by McLaughlin's failures to disclose or truthfully to characterize incidents in his history. The panel also found McLaughlin's demeanor at the hearing and in the course of the proceedings an additional reason to withhold certification. McLaughlin thereafter waived his right to a Review Hearing by a Statewide Panel as provided by the appeal rules governing procedures before the Character Committee. *RG* 304. The candidate then appealed directly to this Court to review the Committee's decision. *RG* 304:7.

A.

The Character Committee's review of the candidate's application for admission to the bar was prompted by insufficient disclosure of three prior events in the candidate's history: an arrest in Brighton, MA, an arrest in Hoboken, NJ, and circumstances relating to personal automobile insurance.

1. *The Brighton arrest*

All candidates for the New Jersey Bar are required to submit fingerprint cards to facilitate investigation of any criminal history.

The fingerprint check on McLaughlin turned up a 1985 felony arrest for larceny of a motor vehicle in Massachusetts. As a result of the fingerprint check, McLaughlin's file was flagged for investigation of the apparent non-disclosure of the 1985 arrest.

The Character Committee discovered that this charge had been downgraded to a misdemeanor charge of using a motor vehicle without authority, and that McLaughlin entered into a conditional discharge program without a plea, conditioned on an alcohol abuse evaluation by a psychiatrist, and payment of costs and restitution.

McLaughlin's application form itself revealed no mention of the Brighton incident, despite the fact that the form specifically requested such disclosure and provided space for brief answers.[1] Furthermore, none of the three attachments fastened to McLaughlin's Candidate Statement (a "Job History" consisting of two pages; a one-paragraph explanation of a 1994 disorderly persons arrest in Hoboken, N.J.; and a one-paragraph explanation of a suspension of his New York driver's license) referred to the 1985 Massachusetts arrest.

---

[1] The application consists of a "Certified Statement of Candidate," which is a sixteen-page questionnaire. Question X, part B on page 10 of the Statement asks whether the candidate had ever been "charged with, arrested for, or convicted of, the violation of any law (other than minor traffic violations)." The question further specifies that "the entry of an expungement or sealing order does not relieve you of the duty to disclose the matter on this statement." McLaughlin responded affirmatively to this question, indicating a prior charge.

McLaughlin also responded in the affirmative to Part E of Question X, located on the same page, which asked whether candidate was "currently the subject of any investigation or inquiry by any Federal, state, local or administrative agency relating to the alleged violation of law, rule, regulation or other legal standard[.]"

Also on the same page is Part F, which instructs that if the candidate has responded affirmatively to any part of Question 10, the candidate is required to "state the nature of the proceeding and give full details, including narrative of facts, dates, case numbers, name and location of court, if any, references to court records, facts and disposition. Attach copies of all arrest records, court documents and certificates of disposition." In response to this section, McLaughlin checked the box that indicated further documentation was attached.

When the Character Committee contacted McLaughlin regarding the apparent nondisclosure, McLaughlin requested a copy of his application papers because he had not kept one, even though all candidates are instructed to save a copy for their records.

Thereafter, McLaughlin sent the Committee an affidavit, dated November 15, 1994, with a one-page attachment summarizing the 1985 arrest. *See infra* at 140–41, 675 *A.*2d at 1104–05. In the affidavit, McLaughlin claimed that he originally submitted the attachment to the Board of Bar Examiners with the Certified Statement. He explained that he completed all of the attachments in the same day at the Rutgers Law Review offices, and even showed the description of the 1985 incident to some persons who were in the offices that day.

At the hearing, McLaughlin contended that the attachment was included with his application, but that the Committee had lost it. Although he admitted that he was not "infallible," and explained that he might have forgotten to include the attachment in his application, McLaughlin asserted that his principal belief was that he had submitted the document with his Certified Statement and that the Committee had lost it. Character Committee Staff Attorney Martha Treese testified at the Hearing that she had personally checked the application papers that were originally submitted by McLaughlin and found no such attachment. She further testified that because the other attachments were securely fastened to the Certified Statement, she had no reason to believe that a member of her staff had lost the document referring to the Brighton arrest.

Though he claimed that he did not keep a copy of the original application papers, McLaughlin testified at the hearing that he did save the attachment regarding the 1985 arrest. McLaughlin also claimed that he did not attach the arrest records for the 1985 arrest because they were under seal and he was unable to obtain them. Immediately after the hearing, however, the candidate was able to obtain copies of the 1985 arrest records and provide them to the panel. McLaughlin explained this incongruity by asserting

that he was only able to retrieve those records after the hearing because he could claim that they were needed for a court appearance.

In his affidavit submitted prior to the hearing, McLaughlin claimed that he showed the document recounting the 1985 arrest to "various members of the Computer and Technology Journal, certain members of the Law Review and other law students and friends." When questioned at the hearing regarding those persons, however, McLaughlin admitted that when he contacted them prior to the hearing, they had no recollection of seeing the document relating to his 1985 arrest.

The candidate produced two witnesses at the hearing, both of whom testified that they had seen or heard the substance of the attachment referring to the 1985 arrest. Both witnesses were unable to provide exact dates for their reading or hearing of the attachment, though one witness asserted that the statement was read to her over the phone on the day it was due, because McLaughlin called her later that day to tell her he had mailed his application.

Although McLaughlin claimed the testimony demonstrated that he eventually decided to disclose the 1985 incident by attaching a description to his Certified Statement, at best, the witnesses' testimony indicated only that the candidate may have prepared a statement regarding the arrest at the time he submitted his application.

The Character Committee panel noted the stylistic and formatting differences between the descriptions included in the original application, and the description of the 1985 incident that McLaughlin later sent to the Committee. For example, the panel noted that the account of the 1985 arrest was several paragraphs long and included paragraph indentations; in contrast, the descriptions originally included with McLaughlin's Certified Statement were single-paragraph accounts with no indentations. In addition, although McLaughlin asserted that the other details of the writings were the same, such as the margin width and

typeface, the panel inferred that the writings were not completed at the same time in light of the "florid language" and flippant tone of the 1985 description, which differed from the spare diction and straightforward tone of the other items.[2]

---

[2] The statement described the Brighton arrest as follows:

In January of 1985, at the age of eighteen, I was arrested on charges of theft of a motor vehicle. That charge was subsequently reduced to "misappropriation of property," a misdemeanor. The case was subject to pretrial intervention and the record was sealed. I was arrested by Boston College Police on the campus of Boston College. I was arraigned and tried in Brighton, Massachusetts. I have been advised that my records are sealed and are unavailable, even to me.

The salient facts of the matter, to the best of my imperfect memory, are as follows. In late January, 1985, myself and several fellow Providence College freshmen hitchhiked to Boston to see the Boston College hockey game. During the course of the afternoon, prior to the game, we, myself in particular, became intoxicated. Due to my relative inebriation, I was ejected, alone, from the hockey arena long before the scheduled end of the game.

Left to my own devices and armed only with a severely diminished intellectual awareness, I was struck by two distinct realities. The first was that I was a stranger in a strange land. The second was that it was very dark and very cold. I decided then that I must first forage for shelter and then recoup my wits and assess the situation. Shelter came in the form of an unlocked Jeep on the front lawn of a party. Once inside the Jeep, I began to fiddle haphazardly with the controls, with a mind towards turning the radio on. As bad luck would have it, the ignition caught and lo, the car itself was on. Insatiably curious, I sought to confirm that the car was actually on, which struck me as decidedly unlikely, by putting it into gear. Things rapidly went from bad to worse.

No sooner had I confirmed that the car was, in fact, engaged, than I was set upon by the putative owners of the vehicle. With hostiles in hot pursuit, I decided that flight was the expedient decision. Having only received my license some six month previous, and polluted beyond redemption, I did not get far in my ill advised escape, before crashing into another parked vehicle. In due course I was arrested.

As previously stated, I was arrested and ultimately found guilty in Brighton court of a misdemeanor. My penalty was full restitution to the owners of both vehicles, six months probation, after which my record was sealed, and counseling regarding alcohol abuse. I complied and the record was sealed. Unfortunately, I have no documentation regarding this incident, and all inquiries have been rebuffed.

## 2. *The Hoboken arrest*

Another item indicating a lack of candor on McLaughlin's Candidate Statement concerned a 1994 Hoboken disorderly persons arrest.[3] Notably, the panel found that applicant's explanation of this arrest arising from his involvement in a "peaceful political protest" was disingenuous. Further investigation by the panel revealed that McLaughlin's brief rendition of the incident set forth in his application was incomplete and misleading.

JoAnn Italiano, Staff Investigator for the Committee on Character, described her investigation into the incident as follows:

On March 22, 1995, at approximately 7:00 pm, I telephoned Detective Richard Burgos [the arresting officer in the disorderly conduct offense] from the Hoboken Police Department in reference to his arrest of Mr. McLaughlin on April 30, 1994. Detective Burgos recalled the incident and stated Mr. McLaughlin was on the front steps entrance of the Hoboken Police Department at around 2:30 am. He was accompanied by a couple of friends. They were on the steps waiting for a friend who was arrested earlier in the evening. Mr. McLaughlin appeared very intoxicated and was using abusive language while blocking the main entrance to the police department. This incident occurred during the weekend, early Sunday morning, and Detective Burgos stated their [sic] is alot [sic] of pedestrian activity entering and exiting this entrance. When Detective Burgos told Mr. McLaughlin and his friends to leave, his friends apologized and left, while Mr. McLaughlin continued to block the entrance and use abusive language. After several attempts to get Mr. McLaughlin to leave and he refused he was placed under arrest and charged with [a violation of *N.J.S.A.*] 2C:33-2 (b) [of the] disorderly persons act.

---

The style and content of this statement contrasts sharply with the other statements that were undisputably attached to the candidate's application. See statements, *infra* at 142 n. 3 and 143–44 n. 4, 675 A.2d at 1105 n. 3 and 1106 n. 4.

[3] McLaughlin's entire description of the Hoboken incident attached to his application reads:

On April 30, 1994 at approximately 2:30 in the morning I was arrested on the steps of the Hoboken Police Headquarters where I was engaged in a peaceful political protest. I was originally charged under NJSA 2C:33b for engaging in offensive speech. This charge was dismissed by Judge London, Hoboken Municipal Court, on May 25, 1994, on the basis that the statute was unconstitutional. Prior to dismissal, Judge London gave the police officer and prosecutor the opportunity to rewrite the charge. The charge was rewritten as a municipal violation for having disturbed the peace by refusing to leave the steps of police headquarters. I have opted to have this case tried. As yet, no trial date has been set.

In a motion in Hoboken municipal court challenging the arrest, McLaughlin stated that the incident began when, "for lack of anything better to do," he launched into a monologue consisting mainly of jokes about police officers' fabled fondness for donuts. He related that "[a] few minutes later, when I was nearing the apex of my comic ability, Detective Burgos approached me and told me to take my 'comedy act somewhere else.'" McLaughlin was charged with a disorderly persons offense for using offensive language and failing to leave when asked. The trial court ruled that the offensive language charge was unconstitutional, and offered the prosecutor an opportunity to amend the charge. The charge was amended to reflect a failure to move at the direction of a police officer. The amended charge was eventually dismissed, however, because the arresting officer failed to appear at subsequent hearings.

### 3. *Circumstances relating to personal automobile insurance*

The panel also identified McLaughlin's pattern of dealings with his automobile insurer as further indication of McLaughlin's lack of candor. McLaughlin testified that he resided only in New Jersey since his graduation from college in 1988, but that during that time, he registered two cars in New York State, using his parents' address in upstate New York. He testified that he did so in order to obtain lower insurance rates for the kind of high coverage limits he wanted. McLaughlin further stated at the hearing that he now knows his behavior was illegal.

Moreover, although McLaughlin did indicate in his attachments to the Certified Statement that his New York license was suspended for a time in 1993 due to nonpayment of premiums, he failed to reveal that the license, reinstated in January 1994, was subsequently suspended again in June 1994 for operation of a vehicle without insurance.[4] The candidate testified at the hearing that he

---

[4] McLaughlin's attachment regarding his driver's license suspension reads, in its entirety:

first knew about the revocation of the license in July 1994. Though McLaughlin acknowledged that he knew he had a continuing duty to report the change in his driver's status, and stated that he meant to tell the Committee, he did not disclose any information regarding the incident to the Committee until a Committee investigator questioned him in November 1994.[5]

The panel also noted that the applicant failed to submit a driver's license abstract (a record of the individual's driving history) though all candidates are required to submit such documentation. McLaughlin testified that he did not submit a driver's license abstract because he did not know what an abstract was. The Panel questioned McLaughlin's failure to inquire into the nature of an abstract, asking why he did not contact the Bar Admissions office or the Department of Motor Vehicles, either of which would have supplied him with the relevant information. McLaughlin provided no explanation for his failure to investigate how to obtain the driver's license abstract.

## B.

The second major area of concern relating to the candidate's character and fitness arises from the candidate's conduct before the panel and his treatment of court personnel during the course of these admission proceedings. McLaughlin's responses throughout were intemperate and inappropriate; the content and tone of

---

My NY license was suspended for a brief period earlier this year for failure to pay auto insurance premiums. Unfortunately, I was impoverished at the time, and did not have the money until some time later. Ultimately, upon payment, my license was restored. At no time did I operate the vehicle while the insurance was lapsed.

[5] McLaughlin stated that due to a medical emergency in a friend's family, he drove his car into Manhattan, knowing that the vehicle was uninsured. He was stopped for lapsed registration, and, as a result of a review of the vehicle's paperwork, he was given a ticket for driving with lapsed insurance. According to McLaughlin, due to financial problems and difficulties in receiving forwarded mail, he failed to pay the fine imposed with the ticket, and his license was later revoked in October 1994.

his communications were sarcastic, flippant, and snide; his attitude condescending and disrespectful.

An example relates to the panel's concern about the differences between the content and format of the attachment to the Candidate Statement and that of the subsequently-submitted document explaining the 1985 Brighton arrest. The panel explored the apparent discrepancy with the candidate:

[Candidate]: They are the exact same—we can carbon-date them if you would like, those are—

[Panelist Rand]: I assume you are being facetious.

[Candidate]: I was being facetious.

The record reveals another instance when the candidate was impatient and snide with the panel members. This dialogue occurred in reference to a panel member's question regarding a possible problem with alcohol:

[Panelist Matthews]: ... have you ever abused alcohol subsequent to that time?

[Candidate]: In what respect abused alcohol?

*　　*　　*　　*　　*　　*　　*　　*

[Panelist Matthews]: Let me define it for you in a way you might understand it[:] to such an extent where you were slurring your speech, not able to walk a straight line, not able to touch your nose with your fingers with your eyes closed, or similar types of lack of control over your physical abilities.

[Candidate]: I have never attempted or been asked to attempt to touch my nose while drinking, that would not be the point. However, I would certainly concede that on occasion I perhaps would not have been able to touch my nose accurately if asked to do so. As well, walking a straight line, I would probably—probably there have been times, and if you are asking, have I not been able to walk a straight line at certain times in the ten years subsequent to that event, I would have to concede, yes, guilty as charged.

As these exchanges indicate, the candidate acted as if the panel's questions were amusing, irrelevant, or unimportant. The candidate's inappropriate remarks in response to inquiries do not appear to have been inadvertent, impulsive, or aberrational. Nor does his apology following the offer to "carbon-date" his submissions appear to have been genuine: he later characterized that exchange as follows: "[a]t this point [I] was interrupted and roundly chastised by Panelist Rand for having introduced science

into the realm of rank speculation, and was never given the opportunity to expand upon his explanation."

His correspondence with court personnel following the hearing provides more extreme examples of sarcasm, flippancy, and inappropriate responses about certain matters. For example, McLaughlin, complaining of delay, described Samuel Uberman, the Assistant Secretary of the Board of Bar Examiners, as "the odious Uberman," and "either a liar or an incompetent, perhaps both," adding "[t]hough Christian charity demands that I resolve my doubts in [Uberman's] favor, and simply attribute his inaction to mere sloth and an ability deficit, I suspect that his torpor is motivated by ill-disguised hostility towards my application."

The Clerk of the Court replied to McLaughlin's letters, containing those expressions, *viz.*:

> I acknowledge receipt of your faxed letters of July 5, 1995, and July 17, 1995, in respect of your application for admission to the bar of New Jersey. Although I asked Mr. Uberman for a status report on your application immediately after receiving your letter—which he promptly gave me—I set your correspondence aside for a time to allow first impressions to fade. **I wanted to be able to respond to the merits of your request and not the hyperbole and intemperate remarks that clouded the otherwise reasonable basis for your inquiry;** that is, the amount of time it was taking to resolve your matter before the Committee.

> * * * * * * * *

> Although it should not be necessary to state, I assure you that neither this office nor the members of the Committee on Character have any interest in delaying the process.

McLaughlin then replied to the Clerk's letter:

> I acknowledge your assurance that Uberman and the other Committee members have no "interest in delaying the process." Nevertheless, the implication that my suspicions were somehow unwarranted is as untenable as the statement that "the Panel members wish to resolve this matter as expeditiously as possible" is comical.

> Although all evidence indicates that Uberman is, at the very least, guilty of exercising malevolent neglect towards my Application to the Bar, I have consistently allowed the possibility that the delays are simply a measure of the man. * * * But why did Uberman delay distribution of an initial draft of the Panel's report—was it malice or incompetence? While I should not have to pose the question, I would be remiss if I did not under the circumstances.

> However, notwithstanding the foregoing, I accept your tacit apologies for the delay and anticipate that you personally will act to see this disgraceful affair

through to its conclusion in an expeditious manner. Further I expect that you will promptly advise me of an anticipated date of completion, and that you will cleave unto that date with a resolve that rivals Uberman's unwavering commitment to lethargy.

McLaughlin ended the letter with a footnote: **"How's that for intemperate hyperbole?"**

## II

■ This Court in *Application of Matthews,* 94 *N.J.* 59, 74, 462 A.2d 165 (1983), addressed the nature of its jurisdiction over admission to the practice of law and the framework within which this authority and responsibility may be delegated in part to duly constituted agencies of the Court. The Court noted in *Matthews* that its Character Committee is authorized to review and investigate applicants for admission to the bar and to conduct hearings in conjunction with that responsibility. The Court, however, retains the power to conduct an independent review of the record in cases concerning character applications, although it "[n]ormally [accords] great deference ... to findings based on testimonial evidence, because of the opportunity 'to observe the demeanor of witnesses and the character of their testimony'." 94 *N.J.* at 74, 462 A.2d 165.

■ Additionally, *Matthews* underscored the importance of the level of proof in character cases, instructing that "unless such evidence of unfitness is clear and convincing, any lingering doubts as to the ability of the candidate to undertake the professional responsibility of a lawyer can be resolved in his or her favor and admission to the bar should be allowed." *Matthews, supra,* 94 *N.J.* at 78, 462 A.2d 165. We note that under our current standards governing bar admissions an applicant has the burden to demonstrate by clear and convincing evidence the requisite character to practice law. *RG* 303:6 (1996).

In this case, we have undertaken an independent review of the record under the standards expressed in *Matthews.* We concur in and accept the conclusions of the panel below, particularly those based on perceptions of credibility.

■ This Court emphasized in *Matthews* that the character traits required of applicants for admission "should be formulated in terms of the qualities of character that attorneys must possess in order to fulfill their obligations to individual clients and to the judicial system." 94 *N.J.* at 77, 462 *A.*2d 165. We stated that:

[t]his Court has consistently held bar membership to be a privilege burdened with conditions. Among the most basic conditions precedent to bar admission are "good moral character, a capacity for fidelity to the interests of clients, and for fairness and candor in dealing with the courts."

\* \* \* \* \* \* \* . \*

Accordingly, we conclude that a bar applicant must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice.

[*Id.* at 75, 77, 462 *A.*2d 165 (citations omitted) ].

■ We note at the outset that the candidate protests that he is not yet an attorney and thus must be judged as an average person, not by the standards imposed on the members of the Bar. He also claims that he lacked adequate notice of the criteria by which his character is now being judged. The argument is fatuous. Candidates for the bar are expected to understand and satisfy the personal, educational and professional requisites that inhere in good character and fitness and are indispensable in one seeking authorization to engage in the practice of law. Good character does not emerge on licensure. It is absurd to suggest that good character is not revealed until a person becomes an attorney. The fundamental character traits of honesty and truthfulness are not valued in the abstract, but are assumed to be inherent aspects of one's personality; they can, and must, be considered the measure of a candidate's eligibility to seek admission to practice law and ability to fulfill the responsibilities of the legal profession.[6] A graduate of law school who is a candidate for

---

[6] The Regulations Governing the Committee on Character effective at the time of McLaughlin's review provide ample notice of the evaluative criteria. *RG* 303:2 provides examples of the type of conduct that will trigger additional investigation by the Character Committee, including "lack of full disclosure by the Candidate to the Committee;" "arrest for or conviction of a crime, (even if

admission to the bar cannot credibly profess ignorance of the traits of good character and fitness that are requirements of the legal profession.[7]

## A.

■ *Matthews* identified truthfulness and honesty as traits of character that are the prerequisites for admission to the bar. 94 *N.J.* at 75, 77, 462 *A.*2d 165. Those standards were reiterated in *Application of Jenkins*, 94 *N.J.* 458, 467 *A.*2d 1084 (1983):

[I]f a candidate conceals the truth or misleads the Committee concerning events in his past that adversely affect his character, the process for reviewing candidates will collapse and no purpose will be served. The purpose of withholding certifications is not to punish the candidate but to protect the public and preserve the integrity of the Courts. We have long and firmly held that "there is no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved. In the legal profession, there must be a reverence for the truth."

---

expunged);" and even current substance abuse. Besides instructing that the candidate's "failure or refusal to supply information" may constitute grounds for withholding certification, RG 202 prescribes the "duty of each candidate ... to disclose all available information requested by the Committee on Character," and also imposes a "continuing duty to disclose changes that occur with respect to information given in response to questions on the Statement." The instructions for filling out the Candidate Statement describe similar obligations of candor. *Supra* at 138 n. 1, 675 *A.*2d at 1103 n. 1.

In addition, the opinions in *Matthews* and *Application of Jenkins*, 94 *N.J.* 458, 467 *A.*2d 1084 (1983), clearly articulate that candidates will be evaluated in terms of their willingness to disclose information on the application and in response to subsequent requests of the Character Committee. *Matthews, supra,* 94 *N.J.* at 75, 462 *A.*2d 165; *Jenkins supra,* 94 *N.J.* at 466–67, 467 *A.*2d 1084.

These principles are reflected in the most recent amendments to the Regulations Governing the Committee on Character, which create a rebuttable presumption that nondisclosure of a material fact on the Candidate Statement is prima facie evidence of lack of good character. *RG* 303:3 (1996).

[7] Candidates for admission to the bar must complete a law school course or pass a national examination on professional ethics. Those include general standards governing professional ethics applicable to attorneys. Our Rules of Professional Conduct expressly proscribe "dishonesty," "deceit," and "misrepresentation," as well as "conduct that is prejudicial to the administration of justice," as "professional misconduct." *RPC* 8.4(c), (d).

[*Id.* at 470, 467 *A.*2d 1084 (citations omitted) ].

The treatment of the 1985 arrest demonstrates a lack of truthfulness and candor. In light of the evidence and circumstances surrounding this issue, the panel concluded that McLaughlin "did *not* include any documentation of the January 1985 arrest in Brighton, Massachusetts with his May 28, 1994, bar application." Furthermore, the panel ruled that "[w]e frankly do not accept the representations that McLaughlin made in his November 15, 1994, affidavit and we further regard them to have been knowingly false."

The panel clearly did not credit the testimony of McLaughlin's witnesses. They had no personal knowledge about whether McLaughlin ever submitted the affidavit and were able to testify only about what McLaughlin told them of the contents of his application. Based on our independent review of the record, we conclude that the evidence is clear and convincing that McLaughlin did not include the subsequently-submitted statement regarding the arrest with his original application, and determine that his failure to submit the information to the Committee on Character was willful and intentional.

Lack of candor is also reflected by the candidate's disingenuous characterization of the Hoboken disorderly persons arrest. Although the panel found that the 1994 arrest for disorderly conduct was a "minor incident," the panel was disturbed by the applicant's attempts to glorify the incident as a "free speech" matter. This Court recognizes that the statute under which McLaughlin was first charged was unconstitutionally broad. However, to characterize the conduct that led to the arrest as a "peaceful political protest" is a transparent deceit. McLaughlin's assertion at the hearing that he was essentially protesting the "unlawful confinement" of his friend served only to perpetuate his mischaracterization of the situation.

The basis for this Court's concern is not the gravity of the misconduct that led to McLaughlin's arrest. McLaughlin's own moving papers in the original proceedings indicate that he was

engaged in police-baiting. It is his self-serving statement that his conduct was a "peaceful political protest" that is inaccurate and misleading. This description was intended to camouflage the unflattering incident. That kind of dissembling reflects an indifference to the need to be completely truthful and candid. Furthermore, it denotes a failure to appreciate that truthfulness and candor apply to all matters that are relevant under the character standards governing admission to the bar.

The candidate's handling of his automobile insurance also indicates a lack of honesty. The panel found McLaughlin's behavior in respect of his insurer was particularly egregious in light of the fact that McLaughlin had himself worked in the insurance industry. Despite McLaughlin's insistence that he had no general knowledge of automobile insurance because he worked in the specialized area of reinsurance, his own testimony at the hearing belies such a claim. For example, he testified that he registered his vehicles in upstate New York to obtain "the high limits I wanted in terms of 100,000/300,000 coverage."

Furthermore, the panel viewed the candidate's explanation of his failure to obtain and submit a driver's license abstract, as required in the application, as indicating a lack of candor. McLaughlin's failure to register his vehicle in New Jersey, and his admission that he failed to do so in order to save on insurance costs, as well as his unjustified failure to secure and submit a driver's license abstract, all lend further support to the conclusion that McLaughlin was neither forthright nor candid in his application and his subsequent dealings with the Committee and the Court.

In this case, the instances of duplicity are more than isolated occurrences; rather, they constitute a pattern of behavior that demonstrates a clear and convincing lack of "reverence for the truth." *Jenkins, supra,* 94 *N.J.* at 470, 467 *A.*2d 1084. Though each episode of dishonesty or lack of candor is not particularly egregious, taken as a whole, the pattern reflects insensitivity and indifference to the need for full and accurate disclosure. This

evidence clearly and convincingly warrants the conclusion that McLaughlin lacks truthfulness and candor, or does not sufficiently understand and appreciate the importance of these qualities of character.

### B.

The panel determined that McLaughlin's attitude and demeanor in his dealings with the panel and with court administrative personnel demonstrated a lack of respect for the administration of justice.

 The candidate again argues a "lack of notice" with regard to the consideration of his demeanor in his dealings with the Committee Panel and other court employees. That contention also lacks merit. The *Matthews* and *Jenkins* opinions clearly teach that the "applicant's attitude as expressed in hearings before the Board of Bar Examiners and any reviewing courts" will be a factor in determining the candidate's present fitness. *Matthews, supra,* 94 *N.J.* at 82, 462 *A.*2d 165; *Jenkins, supra,* 94 *N.J.* at 471, 467 *A.*2d 1084.[8]

 McLaughlin's demeanor and expressions in his correspondence with judiciary officers and employees give ample cause to conclude that he has an insufficient appreciation for the proper administration of justice. McLaughlin was condescending and inappropriately sarcastic while addressing the panel members. He denigrated inquiries into substance abuse even though his own submissions and testimony indicated the legitimacy of the Committee's concern. He treated dismissively observations and comments by panel members intended to elucidate their inquiry. Also, he twisted highly relevant questions seeking the truth as to when material documents were submitted. McLaughlin compared

---

[8] Moreover, that standard has also been codified in the amended regulations. The regulations now explicitly state that the Candidate's candor and honesty before the Conference constitutes a factor to be considered in establishing the candidate's current fitness. *RG* 303:6 (1996).

the panel to the infamous inquisitor, Torquemada, and characterized the proceedings as a "ritual slaughter" and a "pharisaical inquiry". Additionally, he resorted to extreme personal vilification against court employees, indirectly characterizing one as lethargic, slothful, and torpid; as incompetent, negligent, and ability-deficient; and as odious, lying, hostile, malicious, and malevolent.

The candidate's conduct in dealing with the Character Committee and with other judiciary personnel borders on contempt. We have previously noted that:

> Contempt comprehends any act which is calculated to or tends to embarrass, hinder, impede, frustrate or obstruct the court in the administration of justice, or which is calculated to or has the effect of lessening its authority or its dignity; or which interferes with or prejudices parties during the course of litigation, or which otherwise tends to bring the authority and administration of the law into disrepute or disregard. In short, any conduct is contemptible which bespeaks of scorn or disdain for a court or its authority.

> [*In re Daniels,* 118 *N.J.* 51, 68–69, 570 *A.*2d 416 (1990) (citations omitted) ].

In *In re Vincenti,* 92 *N.J.* 591, 603, 458 *A.*2d 1268 (1983) (hereinafter *Vincenti I*), we recognized a "requirement that lawyers display a courteous and respectful attitude not only towards the court, but towards opposing counsel, parties in the case, witnesses, court officers, clerks—in short, towards everyone and anyone who has anything to do with the legal process." As we have noted: "[v]ilification, intimidation, abuse and threats have no place in the legal arsenal." *In re Vincenti,* 114 *N.J.* 275, 282, 554 *A.*2d 470 (1989) (hereinafter *Vincenti II*).

In *Vincenti II,* we analyzed contentious behavior by an attorney in terms of its effect on the judicial system:

> Respondent's conduct is intolerable because it has an effect that tends to undermine the proper administration of justice. Conduct calculated to intimidate and distract those who, though in an adversarial position, have independent responsibilities and important roles in the administration of justice cannot be countenanced. * * * Thus, the undue and extraneous oppression and harassment of participants involved in litigation can impair their effectiveness, not only as advocates for their clients, but also as officers of the court.

> [114 *N.J.* at 281–82, 554 *A.*2d 470.]

■ Officers of the court should not be required to fight through insults and gratuitous accusations of bias in order to preserve their objectivity and fairness. Vituperative behavior creates an atmosphere that can threaten the proper discharge of court functions, including the supervision of bar admissions, and ultimately disserves the public.

We recognized in *Vincenti I,* the harmful effects on the justice system that can arise in an atmosphere poisoned by the lack of civility and basic respect:

The prohibition of our Disciplinary Rules against "undignified or discourteous conduct degrading to a tribunal" is not for the sake of the presiding judge but for the sake of the office he or she holds. Respect for and confidence in the judicial office are essential to the maintenance of any orderly system of justice. This is not to suggest that a lawyer should be other than vigorous, even persistent, in the presentation of a case, nor is it to overlook the reciprocal responsibility of courtesy and respect that the judge owes to the lawyer. Unless these respective obligations are scrupulously honored, a trial court will be inhibited in performing two essential tasks: sifting through conflicting versions of the facts to discover where the truth lies, and applying the correct legal principles to the facts as found. Under the best of circumstances these tasks are difficult; without an orderly environment they can be rendered impossible.

[92 *N.J.* at 603–04, 458 *A.*2d 1268.]

The institutional mischief wrought by such abusive conduct is not merely theoretical. Thus, here, to assure that McLaughlin's complaints would be addressed on their merits, the Clerk of the Court found it necessary to delay a response to McLaughlin's letters in order to avoid being distracted by the applicant's intemperate remarks. *Supra* at 145–47, 675 *A.*2d at 1107–08.

"An attorney who exhibits ... lack of civility, good manners and common courtesy ... tarnishes the entire image of what the bar stands for," *Vincenti II, supra,* 114 *N.J.* at 282–83, 554 *A.*2d 470 (*citing In re McAlevy,* 69 *N.J.* 349, 354 *A.*2d 289 (1976)). The censure of such behavior, however, is justified not merely to enhance the image of the courts and the legal profession. The judiciary does not seek simply to encourage good manners or to foster courtesy and politeness. Rather, it seeks to suppress

incivility, which, if tolerated and unchecked, can render the transaction of judicial business impossible.[9] An orderly environment based on ordinary civility and common decency is essential for the justice system to run evenly. Here, the extreme opposite of civility and decency—impudence and insolence—epitomized McLaughlin's attitude. Such marked disrespect for judicial personnel, procedures and institutions belies the fidelity to the administration of justice that must be possessed by members of the legal profession.

## C.

In light of McLaughlin's failures to disclose and fully and accurately to explain items on his Candidate Statement, it is clear that McLaughlin "does not possess the character traits of truthfulness and honesty that are the fundamental elements for admission to practice." *Jenkins, supra,* 94 *N.J.* at 471, 467 *A.*2d 1084. His demeanor and treatment of members of the Committee on Character and other judiciary employees further demonstrate a disrespect for the administration of justice.

## III

McLaughlin still does not understand or appreciate what caused the Committee to recommend the withholding of his character certification. Indeed, McLaughlin appears to regard his past poor conduct dismissively. He seems indulgently to regard himself

---

[9] Chief Justice Warren E. Burger stated in remarks to the American Law Institute in Washington D.C., on May 18, 1971:

> Someone must teach that good manners, disciplined behavior, and civility—by whatever name—are the lubricants that prevent lawsuits from turning into combat. More than that, civility is really the very glue that keeps an organized society from flying into pieces. * * * I submit that lawyers who know how to think but have not learned to behave are a menace and a liability, not an asset, to the administration of justice.

[Catherine Terese Clarke, *Missed Manners in Courtroom Decorum,* 50 *Md. L.Rev.* 945, n. 87 (1991) quoting Warren E. Burger, *Delivery of Justice* 175 (1990)].

merely as a failed humorist. Moreover, he feels unjustifiably burdened by this process, which seeks confirmation of good character and professional fitness. McLaughlin's lack of insight into his shortcomings leads this Court to conclude that he is not currently a worthy candidate for admission to the New Jersey Bar.

Nevertheless, we recognize the possibility that although the candidate exercised extremely poor judgment and exhibited inappropriate and unacceptable behavior evidencing a lack of requisite good character and fitness, those flaws may not be deep-seated or irremediable. We are mindful that the underlying events that gave rise to these matters were not themselves terribly serious or indicative of any enduring disqualification to engage in the practice of law. In *Matthews,* the Court recognized that reform and rehabilitation are possible and hence relevant in determining an applicant's essential good character and fitness to practice law. 94 *N.J.* at 81, 462 *A.*2d 165. *Matthews* listed a variety of types of evidence that have been found probative of reform and rehabilitation, including candor and respect before the Committee. "In all instances, the applicant must display complete candor in all filings and proceedings required by the Committee on Character. Courts will weigh heavily the applicant's attitude as expressed in hearings before the Board of Bar Examiners and any reviewing courts." *Id.* at 82, 462 *A.*2d 165.

We believe that McLaughlin should be given opportunity to rehabilitate himself, overcome the flaws thus far indicated, and demonstrate the required character traits of honesty, candor and genuine respect for the administration of justice.

Accordingly, we adopt the Committee's recommendation and direct that certification of the candidate's character and fitness be withheld, without prejudice to the candidate's right to present to the Committee, no earlier than six months from the filing date of this opinion, evidence of rehabilitation in accordance with *Application of Matthews,* 94 *N.J.* 59, 462 *A.*2d 165 (1983) and this decision.

So ordered.

*Permission Withheld*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.