693 A.2d 877

IN THE MATTER OF CHEN KORNREICH,
AN ATTORNEY AT LAW.

Argued December 2, 1996—Decided May 23, 1997.

*Walton W. Kingsbery, III*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Brian J. Neary* argued the cause for respondent (*Mr. Neary*, attorney; *Mr. Neary* and *Yung–Mi Lee*, on the brief).

PER CURIAM.

This is an attorney-disciplinary case. Respondent Chen Kornreich was charged with motor-vehicular offenses arising from a car accident with another motorist. Thereafter, respondent misled the municipal court, as well as her own attorney, into believing that her full-time babysitter had been the driver of the car at the time of the accident. As a result of those misrepresentations, the charges against respondent were dismissed and respondent's employee was charged with the motor-vehicle offenses. At that point, respondent unsuccessfully attempted to arrange for her employee not to appear at trial to defend against those charges. When respondent's scheme came to light, the charges against the employee were dismissed.

The matter was referred to the county prosecutor, who charged respondent with criminal offenses based on her conduct. The criminal charges eventually were dismissed after respondent completed the pretrial-intervention program.

The Office of Attorney Ethics also investigated the matter and initiated disciplinary proceedings with the filing of a formal ethics complaint against respondent. She was charged with violations of *RPC* 3.3(a)(1) (knowingly making a false statement of material fact to a tribunal); *RPC* 3.3(a)(4) (knowingly offering false evidence); *RPC* 3.3(a)(5) (failing to disclose to a tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure); *RPC* 3.4(b) (falsifying evidence, counseling, or assisting a witness to testify falsely, or offering an inducement to a witness that is prohibited by law); *RPC* 3.4(f) (requesting a person other than a client to refrain from voluntarily giving relevant information to another party); *RPC* 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); *RPC* 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and *RPC* 8.4(d) (engaging in conduct prejudicial to the administration of justice).

The District Ethics Committee found respondent guilty of ethics violations and recommended imposition of a six-month suspension. The Disciplinary Review Board also determined that respondent was guilty of ethics violations, but it recommended a suspension of one year.

Following respondent's petition to review the DRB's determination, this Court ordered respondent to show cause why she should not be disbarred or otherwise suspended from practice.

I

We recite in detail the facts that we have found by clear and convincing evidence based upon our independent review of the record. That detail is provided to dissipate any possible doubt concerning the factual basis for the Court's ultimate determination

that respondent is guilty of serious ethics violations and that severe discipline is warranted.

A.

On March 16, 1989, at approximately 5:37 p.m., respondent's leased car (a 1989 maroon Mazda) was involved in a car accident with Susan Yezzi, who was driving a 1988 Chrysler New Yorker. The accident, which involved minor dents and scrapes, occurred in the parking lot of Marlboro Plaza, a shopping center in Marlboro. At the time, respondent, who had been admitted to the New Jersey and New York bars in 1985 when she was twenty-three years of age, was twenty-six years old and a sole practitioner in Manalapan, Monmouth County.

According to Yezzi, after the accident, she exited her car and walked toward respondent's car, encouraging respondent to get out of her car to exchange information. Respondent then left the scene of the accident without getting out of her car or exchanging information with Yezzi. Before respondent drove away, Yezzi was able to write down the Mazda's license number and to see respondent clearly for about two minutes.

After respondent drove away, Yezzi completed her errands at Marlboro Plaza and went home. Once at home, she called the police and provided details of her version of the accident. Officer Martin Smith of the Marlboro Township Police Department was assigned to the case and wrote the accident report that same day. Yezzi provided him with the license plate number of the other car, and, after some investigation, he obtained the identity of the car's owner, namely, respondent.

After discovering respondent's identity and address, Smith proceeded to her house, which was in the same development as Yezzi's. He was greeted by Angelique Franson, respondent's live-in babysitter, who informed him that respondent and her husband were on vacation. He asked her who normally drove the Mazda, and she answered that respondent was the primary driver. Smith then inspected the car, took some pictures, and compared the

damage to that done to Yezzi's vehicle. His inspection revealed almost identical damage to the two cars, thus leaving little doubt that they had been in the same accident.

Several days after his conversation with Franson and his inspection of the Mazda, Smith returned to respondent's home and spoke with her. He asked her if she had been involved in an accident on March 16, to which she answered that she had not been. He then asked her if she had been in Marlboro Plaza on that date and, if she had been, if anything had happened. She responded that she had been in the parking lot and that a woman had chased her. (Smith's recounting of this statement by respondent was essentially identical in both his police report and his in-court testimony.) Smith returned to respondent's home on April 11, 1989 to investigate further. Respondent again denied having been involved in the accident. Her husband, Anderson D. Harkov, who was also an attorney, was present, and he, with respondent's backing, threatened to sue Smith if he continued with the investigation. Harkov also stated that he was respondent's attorney and that Smith was therefore not to speak with her.

Shortly thereafter, Smith caused summonses to issue, charging respondent with failing to report an accident, in violation of *N.J.S.A.* 39:4–130, and leaving the scene of an accident, in violation of *N.J.S.A.* 39:4–129. The first hearing on the matter was scheduled for July 24, 1989 in municipal court.

Before the hearing, respondent engaged Charles Brodsky, the father of one of her friends, as her attorney. Respondent and Brodsky have very different accounts of what occurred during their meeting prior to the July 24 court date. Brodsky claims that respondent completely denied involvement in the accident, although she told him that she had had a dispute with a woman about a parking spot, resulting in the woman chasing her with a pocketbook. Brodsky then examined the two cars and concluded, as had Smith, that the two had been involved in the same accident. When Brodsky confronted respondent with the results of his investigation, she continued to deny involvement. However, she

provided Brodsky with an alibi, namely, that she had not driven the Mazda on that day, that she had been driven around by others, and that she had been in a meeting with a private investigator (regarding a case) between 5:15 p.m. and 5:45 p.m. She later provided Brodsky with an affidavit to that effect from the investigator. She also told Brodsky that at about 6:00 p.m., she and her husband had picked up their Toyota from an auto-repair shop. She stated that the incident at Marlboro Plaza regarding the parking space had occurred at 8:00 p.m.

According to Brodsky, respondent then implicated Franson. She stated that Franson had a bank account at the Columbia Savings Bank, which is located at Marlboro Plaza, that the bank had been open until 7:00 p.m. on the day of the accident, and that Franson had been paid on the day of the accident, thus requiring her to deposit the money in her account. She stated that she knew that Franson had made the deposit because Franson had asked to borrow the Mazda to do so. Later, however, after the second municipal-court hearing on September 14, 1989, Brodsky obtained a document from Franson's bank showing that no transactions had been posted to her account on either the day of the accident, March 16, 1989, or the following day. Respondent also provided Brodsky with a photo of Franson (to demonstrate that respondent and Franson had similar appearances) and a copy of the family's auto-insurance policy, which listed Franson as an insured driver of the car. Brodsky never spoke with Franson because Franson had left the State and was living in Oregon.

On July 24, Smith, respondent, respondent's husband, Brodsky, and Yezzi were all in court. Before the hearing on the matter, the judge met with Brodsky, Brodsky's daughter (who is also an attorney), and the municipal prosecutor in chambers. Respondent was not present. Brodsky informed the court and Smith that he would present evidence that Franson, not respondent, had been the driver of the car. He later testified that he had made this representation to the court based on the evidence that respondent provided him, namely, the affidavit from the private investigator

and the information about Franson's bank account and her use of the car to make a deposit. The court then indicated that it would dismiss the charges against respondent. Smith was called into chambers and informed of the disposition and Franson's implication in the offenses; he later issued summonses against Franson, charging her with the same violations with which respondent initially had been charged.

After the conference in chambers, the municipal prosecutor informed Yezzi, who had not seen respondent in court, that she could go home, although he did not inform her at that time that the case against respondent would be dismissed. At the same time, Brodsky approached respondent and her husband and informed them of what had occurred. He also asked them if they would be willing to testify against Franson, to which they responded that they would.

Soon thereafter, the judge went on the bench. In the course of the proceeding, Brodsky repeated in open court the allegations that Franson had been the driver of the car. Respondent was in court during Brodsky's representations. The court then formally dismissed the case against respondent. Sometime after the July 24 hearing, respondent called Brodsky and asked him what would happen if Franson did not show up for her court date, to which he responded that she would lose her driving privileges.

On September 14, 1989 at 9:00 a.m., a hearing was held regarding the charges against Franson, who had been issued a summons arising out of the accident with Yezzi. Franson, who had flown in from Oregon, Smith, and Yezzi were present at the hearing. Although she had been subpoenaed, respondent was not in court when the hearing began. She did, however, appear shortly thereafter. At the hearing, Yezzi observed Franson, whom she never had seen previously. She was adamant that Franson had not driven the Mazda. Franson also denied any involvement, claiming that she had been at home with respondent's children at the time of the accident; she further testified that, on the day of the accident, respondent had arrived home and told her that she had

been involved in an accident and had left the scene with the other driver yelling at her for not getting out of her car. Finally, she testified that respondent had encouraged her not to return to New Jersey for the hearing.

The court then ordered respondent to attend the hearing. When respondent arrived at about noon, she went over to speak with Franson. At that point, Yezzi spotted respondent and immediately informed Smith that respondent had been the driver of the car. Yezzi again identified respondent in her testimony to the court. As a result, the court dismissed the charges against Franson.

Brodsky claims that the court later called him a "liar" because of his representations during the July 24 hearing. No ethics charges were ever filed against him, although the prosecutor's office investigated his conduct (presumably no charges were filed).

After the September 14 hearing, the municipal court judge referred the matter to the Monmouth County Prosecutor's Office and the Office of Attorney Ethics ("OAE"). The Prosecutor's Office charged respondent with providing false information to a police officer with the purpose of implicating another, in violation of *N.J.S.A.* 2C:28–4(a); purposely obstructing the administration of law, in violation of *N.J.S.A.* 2C:29–1; and purposely or knowingly obstructing the exercise of jurisdiction over her person by a court, in violation of *N.J.S.A.* 2C:29–9. Respondent and the Prosecutor's Office entered into a plea agreement under which respondent would enter the pretrial-intervention program ("PTI"), thus allowing her not to admit guilt; she asserts that she entered the program to avoid the adverse publicity of an indictment. She completed PTI successfully on December 21, 1990, and the charges against her were dismissed.

In the course of the ethics investigations, respondent completely denied involvement in the accident. She maintained her alibi of meeting with the private investigator between 5:15 p.m and 5:45 p.m., after which she had gone with her husband to pick up their Toyota from the shop at about 6:00 p.m., had gone to her bank,

and finally had arrived at Marlboro Plaza to go shopping at 8:00 p.m. She produced a receipt showing that she had made a purchase at Caldor (located at Marlboro Plaza) at 7:54 p.m. Respondent also produced the receipt from the auto shop; the receipt, however, showed that she and her husband had picked up the car at 5:05 p.m., not 6:00 p.m., thus providing ample opportunity for respondent to have arrived at the scene of the accident by 5:37 p.m.

Respondent denied having told Smith that, on the day of the accident, she had been chased in the Marlboro Plaza parking lot by a woman with a pocketbook. Instead, she claimed that she had simply seen a woman running with a pocketbook, that she may have seen the woman on a day other than the day of the accident, that the woman was not Yezzi, and that she never had told Smith that the woman had chased her car. She further alleged that, when Smith had come to her house to question her, he immediately had confronted her with the claim that he had three witnesses who could place her at the scene of the accident.

Regarding her accusation against Franson during the July 24 hearing, respondent denied ever having told Brodsky that Franson actually had been driving the car at that time. Instead, she claimed that she had informed him that Franson had borrowed the car at some time during the day of the accident and that, by process of elimination, she may have been the only person who could have been driving the car at the time of the accident; she stated that she had provided him with this information for the sole purpose of casting a reasonable doubt on her own participation in the accident.

According to respondent, Brodsky, without informing her and outside of her presence (she was not in the judge's chambers), fabricated the story about Franson and then, without mentioning the accusations that had been made against Franson, simply informed respondent that his presentation of the alibi defense had convinced the prosecutor that respondent had not been driving the car. Regarding Brodsky's repetition of the allegation in open

court (in respondent's presence), she asserted that she had been unable to hear what was occurring because she had been seated about two-thirds of the way back in the courtroom. However, Brodsky contradicted that assertion by testifying that, when he had been seated next to respondent, he could hear exactly what was occurring in the front of the courtroom. Respondent further claimed that she had not found out about Brodsky's representation to the municipal court concerning Franson until she had ordered the transcripts from the July 24 hearing, which she had not done until after the September 14 hearing. She testified that when she had realized what Brodsky had done, she had concluded that he had done so because of overzealousness and a desire to impress his daughter.

Respondent claimed that, in August 1989, Franson had called her from Oregon and informed her that she had received two summonses from the municipal court regarding the accident. Franson asked her to pay for her airfare and legal fees, to which respondent answered that she would call her back. According to respondent, she then spoke with Brodsky, who informed her that Franson would not be extradited because she had not been served properly. Respondent claimed that she then had called Franson and told her that she would not pay for her airfare and legal fees. She also claimed that she had told Franson that Franson would not be extradited and had done so not for the purpose of obstructing justice, but rather to allay Franson's fear of being arrested and jailed. However, Franson had testified at the September 14 hearing that respondent explicitly told her not to worry about coming back to New Jersey because no one would "come after" her and because it was "no big deal."

Respondent testified that, at the September 14 hearing, Yezzi had identified her only after the court called respondent up to the bench, thus informing Yezzi who she was. Respondent placed significance on that sequence of events because she imputed to Yezzi a motive of desiring to sue respondent instead of Franson in order to obtain a larger monetary settlement. The record of the

proceeding, however, demonstrates that the court did not summon respondent to the bench until after Yezzi independently had identified her to the prosecutor and the prosecutor had relayed that information to the court.

Harkov, respondent's husband (a public defender at the time of the accident and in private practice with respondent today), largely corroborated respondent's version of events, especially regarding the timing of the day of the accident, respondent's alibi, Franson's use of the Mazda on that day, their dealings with Brodsky, and their inability to hear what Brodsky was saying to the judge in open court. However, Harkov testified that he and possibly respondent had spoken with Brodsky afterward, who had informed them that Franson would be charged as a result of the July 24 hearing. Harkov felt that this was "odd," even though he claimed to believe that Franson had been involved in the accident.

## B.

The OAE investigated and presented the case to the District IX Ethics Committee ("DEC"), recommending a six-month suspension. The DEC held hearings on the matter, during which respondent, Harkov, Brodsky, Yezzi, Judge Newman (the municipal court judge), and Smith testified. Franson could not be located, so the transcript of her municipal court testimony, which respondent had had an opportunity to cross examine, was entered into evidence.

The DEC credited the testimony of Brodsky, Smith, Yezzi, and Franson; it refused to credit the testimony of respondent and Harkov. Its factual determinations correspond with the foregoing factual recitation and were based on clear and convincing evidence. It made these specific important factual findings: that respondent and Harkov had picked up the Toyota from the shop at 5:05 p.m. (not at 6:00 p.m.); that respondent, not Franson, had driven the Mazda in the accident with Yezzi; that respondent had made representations and presented documentation for the purpose of misleading the prosecutor and the court about the identity of the driver; that respondent had known that Brodsky, the

prosecutor, and the court, were being misled; that respondent had known, on July 24, that false charges were being filed against Franson; that respondent improperly had attempted to persuade Franson not to appear in court for the September 14 hearing; that respondent had shown no remorse for falsely accusing Franson; that respondent consistently had refused to admit that she was the driver of the car; and that respondent had failed to show candor throughout the disciplinary process.

After making those findings, the DEC concluded that respondent had violated *RPC* 3.3(a)(4), by offering evidence to mislead the municipal court; *RPC* 3.4(f), by attempting to dissuade Franson from attending court; *RPC* 8.4(c), by engaging in dishonesty, fraud, deceit, or misrepresentation; and *RPC* 8.4(d), by engaging in conduct prejudicial to the administration of justice. The DEC adopted the OAE's recommendation of a six-month suspension.

The Disciplinary Review Board ("DRB"), after conducting a *de novo* review of the record, made the same factual findings and reached the same legal conclusions as the DEC by a five-to-two majority.[1] The DRB majority further stressed the consistency of the testimony of Yezzi, Smith, Brodsky, and Franson; Franson's purchase of a ticket to New Jersey to defend herself despite the ease with which she could have avoided sanction by remaining in Oregon; the inconsistencies between respondent's testimony and her prior statements; and the physical evidence (especially the credit-card receipt from the repair shop). In rejecting respondent's version of events, the DRB repeatedly referred to her as "disingenuous," "unworthy of belief," and "not credible." It determined that she was guilty of ethics violations and recommended a suspension of one year.

## II

We conclude that respondent violated *RPC* 3.3(a)(1) and (4), by offering false statements and evidence to mislead the municipal

---

[1] The two dissenting members concluded that clear and convincing evidence of respondent's guilt of the ethics violations had not been presented.

court; *RPC* 3.4(f), by attempting to dissuade Franson from attending court; *RPC* 8.4(b) by committing crimes by falsely implicating Franson, by attempting to interfere with the hearing on the charges against her, and by obstructing the enforcement of the criminal laws, crimes that reflect adversely on an attorney's honesty and fitness; *RPC* 8.4(c), by engaging in a continuing course of conduct based on dishonesty, fraud, deceit, or misrepresentation; and *RPC* 8.4(d), by engaging in conduct prejudicial to the administration of justice.

■ We deal first with the ethics violations established by clear and convincing evidence that respondent knowingly made false statements of material fact and knowingly offered false evidence that misled the court, in violation of *RPC* 3.3(a)(1) and *RPC* 3.3(a)(4).

The fact that it was respondent, and not Franson, who was the driver of the car involved in the accident constitutes the basis for the determination that respondent knowingly made false statements of fact and offered false evidence that were intended to mislead a tribunal. The DRB fully explained its reasons for reaching that critical factual determination based on clear and convincing evidence. It related the details of Yezzi's account of the critical events that underscore the accuracy of her identification of respondent as the driver, *viz:*

Mrs. Yezzi testified (1) that March 16, 1989 was a bright, sunny day and that, at the time of the accident, 5:37 P.M., she could see very clearly; (2) that she stared at the driver for two full minutes, waiting for her to exit the car to exchange insurance information; (3) that she was not in the courtroom on the night of respondent's trial, July 24, 1989; (4) that, on July 24, 1989, the prosecutor had taken her outside of the building and had told her that she could go home; (5) that, therefore, she was not in the courtroom at the time that the judge dismissed the case against respondent on the basis of mistaken identity; (6) that she was not aware until later that summonses would be issued against Ms. Franson as the driver of the car; (7) that she had never seen Ms. Franson before September 14, 1989, the day of Ms. Franson's trial; and (8) that, before the proceedings of September 14, 1989 started, when respondent walked into the courtroom and began to speak with Ms. Franson, Ms. Yezzi called Officer Smith over to her side and told him that respondent was the driver of the car.

The DRB stressed that Yezzi's testimony flatly contradicted respondent's version of the basis for Yezzi's identification of respondent as the driver:

Contrary to respondent's contention, hence, Mrs. Yezzi's identification of respondent as the driver of the car did not take place after the judge called the case and after the judge instructed respondent to come up. Mrs. Yezzi testified that she recognized respondent as soon as she walked into the courtroom and went over to speak to Ms. Franson and that, in fact, she, Mrs. Yezzi, pointed respondent out to Officer Smith. In addition, the transcript of the September 14, 1989 proceeding makes it clear that, only after the prosecutor informed the judge that Officer Smith and Mrs. Yezzi had told him that the driver of the car was the witness on the list and not Ms. Franson, did the judge ask who that witness might be. Following the prosecutor's identification of the witness as respondent the judge asked respondent to come up.

The DRB further emphasized that "[t]he testimonies of Mrs. Yezzi, Officer Smith and Ms. Franson were consistent with each other and with other competent evidence." The DRB then carefully analyzed the testimony of the police officer, as well as that of Brodsky. It found respondent's explanation that she had not been involved in the car accident but had been involved in another incident later that evening at the mall to be "confusing" and that "the meaning of her statement to Officer Smith leads to no other conclusion but that it was contrived."

Further, the DRB found that Franson was a credible witness, whose testimony confirmed that she had not been the driver of the car and that she had been falsely charged:

There is also Ms. Franson's testimony at the September 14, 1989 proceeding that, when respondent arrived home on the evening of March 16, 1989, at approximately 6:00, respondent had told Ms. Franson that she had been involved in an accident and that she had been frightened because a woman had yelled at her for failure to exchange information. Very significant, too, was that Ms. Franson, who seemingly could ill afford to make the trip back to New Jersey to defend herself and to retain a lawyer, did exactly that, notwithstanding respondent's assurances to her that the only consequence from her absence would be the suspension of her driving privileges in New Jersey. No other conclusion can be drawn from Ms. Franson's return to New Jersey but that, having been falsely accused of criminal offenses, she was bent on clearing her name at all costs. Had she been guilty, she probably would not have returned to New Jersey to attend her trial.

The evidence also clearly and convincingly establishes that respondent fabricated her alibi. The DRB concentrated on that evidence:

> More significantly, the credit card receipt unambiguously shows that respondent and her husband picked up the Toyota at about 5:00 P.M. Neither respondent nor her husband offered any explanation tending to show that the 5:05 P.M. time on the credit card receipt was either not accurate or not the actual time when the car was picked up. In light of this overwhelming piece of evidence, respondent could not have met with the investigator until 5:45 P.M., could not have been picked up by her husband at approximately 6:00 P.M., could not have picked up the Toyota at 6:10 P.M., could not have arrived at Marlboro Plaza at 6:30 P.M. and, in fact, was at the Plaza at the time of the accident because she testified that, right after she switched cars with her husband at the Toyota dealership, she headed straight to the mall, a distance of fifteen minutes from the Toyota dealer.

The DRB further explained why it disbelieved respondent and determined that her alibi was false:

> Respondent argued that it would be preposterous for her to be involved in an accident, to go home immediately thereafter, at about 6:00 P.M., to confide to her nanny that she had had an accident that had frightened her and to turn around back to the mall to pick up the passports at the bank at 6:30 P.M. Considering, however, that respondent was not injured, that she presumably did not perceive Mrs. Yezzi to have been hurt, that the damage to both cars had been insignificant, and that she had worked all day and, therefore, had little spare time to get ready for her upcoming trip to Israel, it is plausible that she would have returned to the mall after the minor accident.

The DRB opinion pays scant attention to respondent's having given Brodsky a false affidavit from a private investigator, Robert Kantor, that purported to confirm respondent's alibi. That conduct is particularly disturbing, and, also, directly supports the conclusion that respondent gave false statements and evidence. Brodsky had asked respondent to provide him with an affidavit from Kantor confirming that respondent and Kantor had been in a meeting at respondent's office when the accident took place. That affidavit encouraged Brodsky to believe that Franson had been operating the vehicle when the accident occurred. Respondent herself testified that Brodsky had told her that Kantor's affidavit, as well as the store receipt, convinced the prosecutor that she had not been the driver and that the charges would be dismissed. It appears that Kantor was present the day that the municipal court dismissed the charges.

In sum, respondent lied to her attorney about her involvement in the accident and by blaming her employee for the accident and concocting an alibi about her activities on the date and at the time of the accident. Those representations by respondent were the basis for her attorney's false statements and proffering of false evidence to the municipal court. The false statements and evidence were clearly and knowingly intended by respondent to mislead the municipal court. Her representations, in fact, did mislead the court—they constituted the basis both for the dismissal of the charges against respondent and the issuance of charges against her employee.

We conclude that respondent violated *RPC* 3.3(a)(1) and (4).

In addition to the clear and convincing evidence that demonstrates that respondent misrepresented her own involvement in the accident, respondent's misrepresentations implicated Franson as the driver responsible for the accident, in violation of *RPC* 3.4(f).

The dismissal of the charges against respondent and the filing of charges against Franson were inextricably tied together. The DRB stated:

> Respondent also knowingly allowed the case against her to be dismissed. Her testimony that she was not aware, prior to the dismissal of the charges against her on July 24, 1989, that the central reason why the charges were being dismissed was that the prosecutor believed that Ms. Franson, not she, had been driving the car is unworthy of belief. Mr. Brodsky testified that, after his conference with the prosecutor and Officer Smith, he explained to respondent and her husband why the case was going to be dismissed and that summonses would be issued against Ms. Franson. Mr. Brodsky added that he had asked respondent and her husband if they would be willing to testify against Ms. Franson and that they had agreed. Moreover, respondent's husband admitted that they knew, after the dismissal of respondent's complaint, that charges would be filed against Ms. Franson. Mr. Harkov testified that he thought it odd that they were signing tickets against Ms. Franson and that he did not expect that she would be charged.

The DRB painstakingly analyzed the evidence of respondent's role in and motives for implicating Franson:

> Respondent knew that she was the driver of the car and consciously lied that she was not. Respondent purposely pointed the finger at an innocent party, who by then had left the state, had moved to a place some 3,000 miles away and in all

likelihood would not or could not return to New Jersey to exonerate herself. That respondent might not have told Mr. Brodsky that she, respondent, had personal knowledge of Ms. Franson's use of the car at the time of the accident but that, instead, that fact had been relayed to her by her husband, does not save her from a finding that she purposely implicated Ms. Franson. Respondent knew that she was the driver of the car; she knew that her husband was mistaken that Ms. Franson had used the car at that time; and she knew that Ms. Franson was innocent. Yet, she told Mr. Brodsky about her husband's statement, gave Mr. Brodsky a copy of the insurance policy showing that Ms. Franson was insured under the policy and gave Mr. Brodsky a picture of Ms. Franson to show a possible resemblance between them.

Our own independent analysis and assessment of this evidence lead us to the conclusions that respondent herself created the unmistakable impression with Brodsky that Franson in fact had been the driver of the car and that her husband's representation to Brodsky that Franson had been the driver of the car was neither "mistaken" nor independent of respondent's representation.

The DRB further explained why it disbelieved respondent's claim that she had been unaware of the reasons why the charges against her were dismissed and the charges against Franson were made:

Respondent's further testimony that she had been unable to hear what Mr. Brodsky had placed on the record about the dismissal and about the charges against Ms. Franson is not credible. Mr. Brodsky testified that he was sitting with respondent and with her husband when her case was called by the judge and that he had no trouble hearing. Moreover, Judge Newman testified that, although the courtroom acoustics in 1989 were not as good as they are today, the amplification system at the time consisted of six or seven speakers placed along the walls on both sides of the room from front to rear.

We conclude that respondent violated *RPC* 3.4(f).

▇ Respondent was also guilty of violating *RPC* 8.4(c) by engaging in a continuing course of dishonesty, deceit, and misrepresentation. That dishonest course of conduct also supports her guilt of violating *RPC* 3.4(f). That charge is based essentially on the evidence that established that respondent was the driver of the car, that she implicated Franson as the driver, and that she then perpetuated versions of the facts that were false. Thus, in analyzing and weighing all of the testimony and evidence, the

DRB concluded not only that respondent had been the driver of the car, but that she repeatedly and consistently had lied about it:

> The proofs, thus, clearly and convincingly establish that respondent was the driver of the Mazda on the date in question. That obviously means that she was untruthful to Mr. Brodsky, to Officer Smith, to the municipal court on July 24, 1989, to the prosecutor's office and to the DEC.[2]

As part of that deception, the DRB found respondent's account of her conversation with Franson about Franson's defense against the charges to be untruthful:

> In light of respondent's overall deceitful conduct, the conclusion that she also attempted to dissuade Ms. Franson to come to New Jersey to defend herself is inevitable. The only logical inference is that respondent's so-called assurances to Ms. Franson that no grave consequences would befall her if she did not appear in court were prompted not by any altruistic motive on her part to allay Ms. Franson's fears but, instead, by her intent to let an innocent party take the fall for her criminal offenses.

Respondent's series of lies continued long after she falsely implicated her employee. She was clearly guilty of violating *RPC* 8.4(c). Moreover, her dishonesty and deceit extended to her attempt to dissuade Franson from appearing in court to defend the charges that had been brought against her, with the purpose of avoiding her own exposure as the driver of the car.

■ Respondent's misconduct violated *RPC* 8.4(b) because she engaged in the commission of crimes that reflect adversely on a lawyer's honesty and fitness. As a result of the municipal court judge's referral of the matter to the county prosecutor, respondent was charged with giving false information to a law enforcement officer with the purpose of implicating another, in violation of *N.J.S.A.* 2C:28–4(a); obstructing the administration of law, in violation of *N.J.S.A.* 2C:29–1; and criminal contempt, in violation of *N.J.S.A.* 2C:29–9. We conclude that there was clear and convincing evidence to support those criminal charges. Respondent's implication of Franson in part was based on the version of

---

[2] At the DRB hearing, respondent for the first time seemed to suggest that she could not remember whether she had been involved in an accident on March 16, 1989. The DRB did not accept that assertion, and neither do we.

events that she related to Officer Smith. In addition, respondent implicated her own attorney by first suggesting that he had made statements to the prosecutor and the court without her knowledge or consent. Later, respondent engaged in further deception by suggesting a reason why her lawyer had engaged in that unethical conduct: "he was just trying to dismiss this and be a hero so that his daughter would see what a good job he did for his daughter's friend." The DRB concluded that respondent, not her lawyer, had committed the ethical improprieties:

> Finally, in a last attempt to rid herself of charges of fabrication, deceit and obstruction of justice, respondent attempted to escape responsibility by blaming her former attorney, Mr. Brodsky. Mr. Brodsky's testimony at the DEC hearing, however, which the DEC found credible, was consistent with that of the other witnesses.

Indeed, her conduct exposed Brodsky to criminal jeopardy; because of the municipal court's initial belief that he had lied. As pointed out by the DRB, however, "the prosecutor's investigation disclosed no wrongdoing on Mr. Brodsky's part."

We conclude that respondent violated *RPC* 8.4(b).

■ The evidence finally demonstrates that respondent violated *RPC* 8.4(d) by engaging in conduct prejudicial to the administration of justice. We agree with the DRB's conclusion that respondent's conduct undermined the administration of justice by "fabricat[ing] a defense," "pointing the finger at Ms. Franson," "dissuad[ing] Ms. Franson," "let[ting] an innocent party take the fall," and displaying "deceitful conduct" that seriously misled the court and subverted the enforcement of the criminal laws.

### III

■ Disbarment is normally the appropriate discipline for attorney misconduct that undermines the integrity of the administration of justice. *E.g., In re Giordano,* 123 *N.J.* 362, 367, 587 *A.2d* 1245 (1991); *In re Stier,* 108 *N.J.* 455, 457–58, 530 *A.2d* 786 (1987); *In re DiBiasi,* 102 *N.J.* 152, 156, 506 *A.2d* 719 (1986). In *In re Verdiramo,* 96 *N.J.* 183, 475 *A.2d* 45 (1984), the Court stated that

[p]rofessional misconduct that takes deadly aim at the public-at-large is as grave as the misconduct that victimizes a lawyer's individual clients. Because such a transgression directly subverts and corrupts the administration of justice, it must be ranked among the most egregious of ethical violations.... We believe that ethical misconduct ... involving the commission of crimes that directly poison the well of justice ... is deserving of severe sanctions and would ordinarily require disbarment.

[*Id.* at 186, 475 *A.*2d 45.]

■ Attorney misconduct that undermines the administration of justice is no less serious because it occurs in the municipal courts. *E.g., In re Edson,* 108 *N.J.* 464, 530 *A.*2d 1246 (1987); *In re Yaccarino,* 117 *N.J.* 175, 201, 564 *A.*2d 1184 (1989) (involving judicial discipline).

Moreover, disbarment may be warranted even if the attorney is not acting in his or her capacity as an attorney. *See In re Rigolosi,* 107 *N.J.* 192, 526 *A.*2d 670 (1987) (ordering disbarment for interfering with administration of justice through bribery, despite respondent's nonlawyer role). The DRB correctly discounted respondent's claim that she had been acting only in her capacity as a defendant legitimately trying to defend herself, *viz:*

The evidence is equally clear and convincing that respondent knowingly implicated an innocent party, Ms. Franson, in the matter. The Board rejected respondent's argument that her statements to Mr. Brodsky were designed to raise a reasonable doubt as to her own guilt.

■ Respondent's ethical misconduct in violation of *RPC* 8.4(b) involved the commission of crimes that not only reflect adversely on a lawyer's honesty and fitness but also directly poison the well of justice. In fact, as a result of the municipal court's referral to the county prosecutor, respondent was charged with the crimes of giving false information to a law enforcement officer with the purpose of implicating another, obstructing the administration of law, and criminal contempt. Those crimes directly involved conduct that subverted the justice system. We note that respondent was permitted to enter the PTI program and that after she completed the program, the charges against her were dismissed. Nevertheless, we find by clear and convincing evidence that respondent was in fact guilty of those charges. *See, e.g., In re*

*Yaccarino, supra,* 117 *N.J.* at 200, 564 *A.*2d 1184 (finding that evidence established criminal charges in judicial disciplinary proceedings, even though respondent had not been indicted); *In re Edson, supra,* 108 *N.J.* at 472, 530 *A.*2d 1246 (finding basis for disbarment even in absence of conviction); *In re Rigolosi, supra,* 107 *N.J.* at 206–07, 526 *A.*2d 670 (stating that, even though criminal charges had not resulted in guilty verdict, guilt had been established by clear and convincing evidence in disciplinary proceedings).

Respondent's misconduct involved giving false statements and false evidence designed to mislead the municipal court in violation of *RPC* 3.3(a)(1) and (4), which subverted the administration of justice. *Cf. In re La Rosee,* 122 *N.J.* 298, 312–13, 585 *A.*2d 326 (stating that dishonesty in the practice of law undermines the administration of justice and disbarring attorney for, among other misconduct, encouraging former client to present false testimony in a criminal prosecution). That conduct was exacerbated because it placed innocent people in serious jeopardy; her attempt to frame Franson for the accident and then to blame her attorney for the accusations against Franson and the fabrication of the alibi defense added to the seriousness of her actions.

The tribunals below did not believe that disbarment or even an extended suspension was warranted. We disagree with their perception of the gravity of respondent's violations and their reasons for imposing lesser discipline.

Respondent's offense is worse than that presented in *In re Lunn,* 118 *N.J.* 163, 570 *A.*2d 940 (1990). In that case, we suspended an attorney for three years for lying to a court by submitting a false document in relation to a personal-injury suit that the attorney was pursuing. There, however, soon after the action was referred to a prosecutor for investigation, the attorney admitted his complicity in writing the document and signing someone else's name to it. Although the attorney had lied about the document during a deposition, he had not falsely accused another person and had not implicated an innocent party in

criminal acts. The attorney admitted his guilt to the ethics committee even before he became involved. Respondent, however, has not taken that step. Even at the DRB hearing, respondent "displayed a steadfast refusal to admit her wrongdoing and to show any morsel of contrition."

This case is more like *In re Conway*, 107 *N.J.* 168, 526 *A.*2d 658 (1987), and *In re Rigolosi, supra*, 107 *N.J.* 192, 526 *A.*2d 670. In those cases, the attorneys involved sought to obstruct justice by bribing a policeman and tampering with a witness in order to obtain the dismissal of criminal charges against a defendant. We found the conduct in those cases so egregious that we ordered disbarment. What made those cases so extraordinary was not the underlying subject matter, charges arising out of an altercation between a police officer and the defendant, but rather the perversion of the justice system by the attorneys. We have precisely that set of facts here. The accident and the flight from the scene of the accident were minor infractions. Here, the gravity of the offense, however, is based on respondent's attempt to avoid prosecution by framing an innocent person for violations of law and her subsequent attempt to eliminate any possibility that the innocent person would contest her guilt and thereby implicate respondent.

### B.

We now consider whether there are mitigating factors militating against severe discipline.

Respondent has submitted a substantial number of letters from friends, colleagues, and relatives praising her character and integrity. She also relies on her charity and pro-bono work, which we have recognized as mitigating. *E.g., In re Alcantara*, 144 *N.J.* 257, 268, 676 *A.*2d 1030 (1995). That evidence is relevant in several respects, including whether the conduct was aberrational, whether she can be rehabilitated, and whether failure to disbar her will substantially harm the image of the legal profession.

Respondent also claims that her offense resulted from panic. That factor is not particularly weighty because respondent persist-

ed in an unethical course of conduct, greatly undermining her contention that panic can explain her actions. She also claims that she reimbursed Yezzi and Franson and that no permanent harm was suffered. However, the gravity of the offense cannot be measured solely by the monetary nature of the harm to the victims.

Respondent points to her lack of personal or financial gain. She notes that because Franson was listed on the auto-insurance policy, Franson's being charged with the accident would have caused respondent's insurance rates to rise just as much as if respondent were charged with the accident. Still, respondent sought to gain a personal benefit by shifting the blame to Franson in order to escape prosecution and to avoid embarrassment and adverse publicity.

Respondent further alleges that this whole affair has caused her a number of hardships, including negative publicity, high legal fees, a criminal prosecution, use of the incident by her courtroom adversaries, and emotional anxiety. She also notes that she provides sixty-five percent of the family's income and that she and her husband have two young children. Those facts are relevant, but they are not entitled to much weight in that they involve the foreseeable consequences of her own wrongdoing.

Respondent asserts that her case is one of first impression in that she made no direct representations to the court and never affirmed her attorney's representations. Specifically she points to her status as a criminal defendant and her right to present a defense casting a reasonable doubt on her guilt. That position in part persuaded two members of the DRB to minimize the existence of the ethics violations. Respondent does, of course, acknowledge that as an attorney she had an ethical obligation to correct the falsehood when it arose. Moreover, respondent's own lies to Brodsky began the process of misrepresentations and the perversion of justice. Although respondent never directly made a misrepresentation to the court and although respondent had the right to remain silent, she had no right falsely to accuse another

individual and to feed her attorney false information for the purpose of misleading the municipal court.

Respondent stresses that she was young (twenty-six) at the time of the incident and that although she had been admitted to the bar for more than three years, she had only opened her law practice five months earlier. She urges the Court to consider those facts in mitigation.

We have viewed youth and inexperience as mitigating factors, even as related to serious ethics violations. *E.g., In re Farr,* 115 *N.J.* 231, 236, 557 *A.*2d 1373 (1989); *In re Stier, supra,* 108 *N.J.* at 459, 530 *A.*2d 786; *In re DiBiasi, supra,* 102 *N.J.* at 155, 506 *A.*2d 719. Certain ethics transgressions, however, import a full measure of blameworthiness without regard to maturity and experience. In *In re Edson, supra,* 108 *N.J.* 464, 530 *A.*2d 1246, the respondent's youth and brief experience in the practice of law did not factor into the Court's decision to order disbarment. The Court disbarred him without taking any particular notice of the fact that his first infraction had occurred before his thirtieth birthday and little more than four years after he had been admitted to the practice of law in New Jersey and that the second incident had occurred fourteen months later. Thus, youth and inexperience, as such, cannot exonerate respondent. Indeed, if respondent were seeking admission to the bar, it is possible, indeed likely, that she would be denied admission unconditionally based on her conduct, despite her youth and lack of professional experience. The applicants whom we previously have admitted conditionally evinced flaws of professional character that were essentially one-dimensional. Respondent, however, demonstrates cumulative character flaws. She was dishonest, *see In re Matthews,* 94 *N.J.* 59, 462 *A.*2d 165 (1983), she committed crimes, *see In re Jenkins,* 94 *N.J.* 458, 467 *A.*2d 1084 (1983), and she demonstrated contempt for the administration of justice, *see In re McLaughlin,* 144 *N.J.* 133, 675 *A.*2d 1101 (1996).

The DRB was also "aware that respondent was a young woman and a new attorney at the time of the accident," but it discounted

the mitigating weight to be accorded respondent's youth and inexperience. We concur in the DRB's perception that respondent's claims based on lack of maturity and experience do not, as such, minimize the gravity of her misconduct, which strongly calls for disbarment. Nonetheless, the DRB believed that respondent's conduct was somewhat understandable:

> However, the Board took into account that, once caught in a web of lies, respondent might have found it difficult to extricate herself. In addition, the Board was left with the feeling that respondent's character is not unsalvageable. She is young and hopefully capable of learning from her own mistakes. For these reasons only, the Board refrained from imposing harsher discipline.

We do not agree with the DRB's reasoning in that respect. Respondent should not be excused in any sense because she was "caught in a web of lies."

There is, however, another factor that lends some weight to respondent's age and inexperience as mitigating factors. Anderson D. Harkov, respondent's husband, testified as a witness and corroborated respondent's defense to the ethics charges, and he may have contributed to respondent's strategy in avoiding the charges against her. Among other things, Harkov stressed in his testimony before the DRB that it was legally (and presumably ethically) proper to defend a criminal case by accusing someone else without regard to the factual basis for the accusation. It is of some significance that Harkov was an experienced criminal lawyer, and was a public defender at the time of these incidents. We thus are not clearly convinced that respondent acted independently. Because of her youth and inexperience, the influence of her more experienced husband may have clouded her judgment and weakened her resolve to act responsibly.

Respondent's lack of sound judgment, clear thinking, and independence cannot in any way diminish her professional responsibility or excuse her misconduct. However, those factors do enable us to believe that with maturity, experience, and professional growth, respondent might have avoided the ethical quagmire into which she fell and that, one hopes, she will be able to avoid in the future. We, therefore, can withhold the ultimate sanction of disbarment.

Her misconduct, however, requires the most severe sanction that this Court generally imposes, short of disbarment. We determine that respondent be suspended for a period of three years.

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

So ordered.

COLEMAN, J., concurring in part and dissenting in part.

I concur in the Court's determination that respondent:

violated *RPC* 3.3(a)(1) and (4), by offering false statements and evidence to mislead the municipal court; *RPC* 3.4(f), by attempting to dissuade Franson from attending court; *RPC* 8.4(b) by committing crimes by falsely implicating Franson, by attempting to interfere with the hearing on the charges against her, and by obstructing the enforcement of the criminal laws, crimes that reflect adversely on an attorney's honesty and fitness; *RPC* 8.4(c), by engaging in a continuing course of conduct based on dishonesty, fraud, deceit, or misrepresentation; and *RPC* 8.4(d), by engaging in conduct prejudicial to the administration of justice.

[*Ante* at 358–359, 693 *A.*2d at 883–884.]

I dissent, however, from the sanction imposed. The only appropriate sanction is disbarment.

The DRB found, and this Court agrees, that

The proofs ... clearly and convincingly establish that respondent was the driver of the Mazda on the date in question. That obviously means that she was untruthful to Mr. Brodsky [her lawyer], to Officer Smith [the investigating officer], to the municipal court on July 24, 1989, to the prosecutor's office and to the DEC.

Even after having been confronted with her lies, respondent refused to admit her complicity before the DEC; rather, for the first time, she ludicrously suggested that she could not recall if she was in a car accident on the date in question. To this day that is the closest respondent has come to expressing remorse.

Far worse than the conclusion that respondent was in a car accident, fled the scene of the accident, and lied to numerous people about being in the accident, is the DRB's conclusion that "respondent knowingly implicated an innocent party, Ms. Franson, in the matter." The DRB found:

Respondent knew that she was the driver of the car and consciously lied that she was not. Respondent purposely pointed the finger at an innocent party, who by

then had left the state, had moved to a place 3,000 miles away and in all likelihood would not or could not return to New Jersey to exonerate herself.

Respondent's series of lies continued long after she falsely implicated her nanny. *Ante* at 365, 693 *A.*2d at 887. Respondent lied about what her attorney had told her concerning the reason for the dismissal of the case against respondent in the municipal court. She lied about not having been able to hear what transpired in court the day her case was dismissed. Those lies led to her attorney having his ethics called into question when the municipal court determined that it had been misled. Instead of then acknowledging her involvement and deception, respondent added to her lies and further implicated her own attorney by first suggesting that he made statements to the prosecutor and the court without her knowledge or consent. *Ibid.* at 365, 693 *A.*2d at 887. Later, respondent even crafted a reason why her lawyer would have been unethical: "he was just trying to dismiss this and be a hero so that his daughter would see what a good job he did for his daughter's friend." *Ibid.* at 365–366, 693 *A.*2d at 887–888. The DRB concluded that respondent, not her lawyer, had committed the ethical improprieties. *Id.* at 366, 693 *A.*2d at 888. It found:

Finally, in a last attempt to rid herself of charges of fabrication, deceit and obstruction of justice, respondent attempted to escape responsibility by blaming her former attorney, Mr. Brodsky. Mr. Brodsky's testimony at the DEC hearing, however, which the DEC found credible, was consistent with that of the other witnesses.

Even more alarming is the DRB's conclusion that respondent attempted to obstruct justice.

In light of respondent's overall deceitful conduct, the conclusion that she also attempted to dissuade Ms. Franson to come to New Jersey to defend herself is inevitable. The only logical inference is that respondent's so-called assurances to Ms. Franson that no grave consequences would befall her if she did not appear in court were prompted not by any altruistic motive on her part to allay Ms. Franson's fears but, instead, by her intent to let an innocent party take the fall for her criminal offenses.

I share the DRB's concern that the gravity of respondent's offenses is exacerbated by the eight-year period of deceit that continues to this day. Even at the DRB hearing, respondent

"displayed a steadfast refusal to admit her wrongdoing and to show any morsel of contrition." *Id.* at 367–368, 693 *A.*2d at 888–889.

Respondent was repeatedly dishonest, she victimized others, showed contempt for the judiciary, and persisted in this conduct for eight years. Respondent's offenses are worse than those we saw in *In re Lunn,* 118 *N.J.* 163, 570 *A.*2d 940 (1990). *Ante* at 367, 693 *A.*2d at 888. In that case, an attorney was suspended for three years for lying to a court by submitting a false document in relation to a personal injury suit the attorney was pursuing. *In re Lunn, supra,* 118 *N.J.* at 166, 169, 570 *A.*2d 940. There, however, soon after having the action referred to a prosecutor for investigation, the attorney admitted his complicity in writing the document and signing someone else's name to it. *Id.* at 166, 570 *A.*2d 940. Although the attorney had lied during a deposition about the document, *ibid.,* he did not falsely accuse someone else and did not implicate an innocent party in criminal acts. Unlike respondent, Lunn admitted his guilt before the ethics committee became involved.

The record clearly and convincingly establishes that the present case is like *In re Conway,* 107 *N.J.* 168, 526 *A.*2d 658 (1987), and *In re Rigolosi,* 107 *N.J.* 192, 526 *A.*2d 670 (1987). In those cases, the attorneys involved sought to obstruct justice by bribing a policeman and tampering with a witness in order to obtain the dismissal of criminal charges against a defendant. *In re Conway, supra,* 107 *N.J.* at 180, 526 *A.*2d 658; *In re Rigolosi, supra,* 107 *N.J.* at 193, 526 *A.*2d 670. The Court found the conduct in those cases so egregious that disbarment was ordered. *In re Conway, supra,* 107 *N.J.* at 184, 526 *A.*2d 658; *In re Rigolosi, supra,* 107 *N.J.* at 211, 526 *A.*2d 670. What made those cases so extraordinary was not the underlying subject matter, an altercation between a police officer and the defendant, but the perversion of the justice system by the attorneys. *Ante* at 368, 693 *A.*2d at 888. We have precisely that set of facts here. The accident and the flight from the scene of the accident represent minor infractions. The heinous nature of the offense was respondent's obtaining a

false affidavit to support her phony alibi; her attempt to frame an innocent person in a criminal act; and then her attempt to ensure that the innocent person actually took the fall by not contesting her guilt.

The record clearly and convincingly establishes that respondent was dishonest, committed crimes, demonstrated contempt for the administration of justice, and poisoned the well of justice. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984). Respondent's conduct demonstrates her reckless and flagrant disregard of the rules of professional conduct and "the honor and integrity demanded of a member of the bar in the practice of law." *In re Pennica*, 36 *N.J.* 401, 423, 177 *A.*2d 721 (1962). A lawyer owes a "duty of good faith and honorable dealing to the judges before whom he [or she] practices his [or her] profession." *Id.* at 428, 177 *A.*2d 721. Consideration of the totality of respondent's conduct convinces me that she is no longer worthy of the Court's endorsement as being fit to practice law in this State. I therefore would disbar her.

I do not regard respondent's prior unblemished record and her partial reliance on assistance from her husband as sufficient mitigating factors to preclude disbarment. "[E]ven if it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it." *In re Hughes*, 90 *N.J.* 32, 36–37, 446 *A.*2d 1208 (1982). Here, respondent's conduct was for personal gain: to avoid being charged with traffic offenses. Knowingly or purposely offering false evidence to a court to mislead that court, falsely implicating an innocent person and then attempting to persuade that person not to appear in court, obstructing the enforcement of the criminal laws of this State, and perpetrating fraud and deceit on a court, surely fall into the category of cases in which disbarment is necessary "to foster public respect for the integrity of the administration of justice." *In re Gross*, 85 *N.J.* 26, 29, 424 *A.*2d 421 (1980).

I would disbar respondent because her conduct was so egregious and so inimical to the integrity of the judicial system that any lesser sanction would fail to protect the public.

Chief Justice PORITZ joins in this opinion.

*For suspension*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—5.

*For disbarment*—Chief Justice PORITZ and Justice COLEMAN—2.

### ORDER

It is ORDERED that **CHEN KORNREICH** of **FREEHOLD**, who was admitted to the bar of this State in 1985, is hereby suspended from the practice of law for a period of three years, effective June 18, 1997, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of her suspension and that she shall comply with *Rule* 1:20–20 which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.