701 A.2d 907

IN THE MATTER OF THE APPLICATION OF
ROBERT J. TRIFFIN FOR ADMISSION
TO THE BAR OF NEW JERSEY.

Argued September 8, 1997—Decided October 22, 1997.

*John J. Janasie*, Assistant Ethics Counsel, argued the cause on behalf of the Committee on Character.

*Robert J. Triffin* argued the cause *pro se.*

The opinion of the Court was delivered by

GARIBALDI, J.

Robert J. Triffin (Triffin or candidate) passed the written examination for the New Jersey Bar in 1993. He had been denied admission to the Pennsylvania Bar in 1992. His Certified Statement for admission to the New Jersey Bar disclosed various civil

proceedings, including a bankruptcy filing and outstanding judgments against him. After three hearings, an RG 303 Panel, convened pursuant to the Regulations Governing the Committee on Character (RG 303), recommended that Triffin's certification for admission to the New Jersey Bar be withheld. That recommendation was based on the Character Committee's conclusion that the candidate did not possess the fitness and good character essential for the practice of law.

Triffin requested a Review Hearing by a Statewide Panel as provided by RG 304. In its Report and Recommendation, the RG 304 Panel concurred with the RG 303 Panel's recommendation that certification of good character be withheld. Triffin then appealed directly to this Court to review the Character Committee's Recommendation. We granted Triffin's request for oral argument.[1]

I

In determining that Triffin was unfit to practice law, the Committee relied on the Pennsylvania courts' findings of civil fraud, unauthorized practice of law, and unprofessional conduct in two contested legal matters; Triffin's lack of respect for the judicial process; his lack of financial responsibility; and the lack of even a "scintilla of evidence" of rehabilitation.

A.

The Continental Bank Matters

Robert J. Triffin graduated from Temple University in 1973. From 1973 to 1986, Triffin was self-employed as a collection agent. Triffin purchased commercial paper and then sued for recovery in his own name in the Court of Common Pleas of various counties in

---

[1] On November 28, 1995, the Court entered an Order granting Triffin's motion for leave to have this matter proceed under the *1991 Regulations Governing the Committee on Character*.

Pennsylvania. In 1974, Triffin incorporated General Funding, which was a non-recourse purchaser of delinquent commercial accounts. In 1984, Triffin incorporated a second company, Great States Leasing, Inc. (Great States), to purchase obligations and debts incurred under leases of personal property.

During the fall of 1984, in order to pay vendors of the leased equipment faster than competitors, Triffin made financial arrangements with General Funding's best customers. Those arrangements involved giving to customers presigned checks on General Funding's bank account. In 1984, Triffin expanded this practice by issuing blank presigned checks to Henry Wexler, President of Pioneer Gate Company (Pioneer), an assignor of post-dated checks. Pioneer accepted post-dated checks from its customers and then discounted those checks to General Funding.

In March 1985, Triffin brought suit against Continental Bank, the bank where General Funding had its bank account. Triffin claimed that Continental had wrongfully paid on a check drawn to the order of Pioneer on General Funding's account. Continental Bank counterclaimed, alleging that Triffin had been a party to a check-kiting scheme and had negligently or fraudulently caused the overdraft in General Funding's account.

Triffin did not cooperate in the pre-trial discovery connected with the *Continental Bank* litigation. He did not appear for a deposition scheduled for August 5, 1987. As a result, on October 30, 1987, the court directed Triffin to appear for depositions or suffer sanctions. Despite the order, Triffin failed to appear at a deposition scheduled for November 24, 1987. The court then ordered Triffin to pay $150 in counsel fees to Continental Bank. Triffin failed to pay those fees or to appear for a deposition scheduled for March 11, 1988. Finally, on April 22, 1988, the court entered an order dismissing Triffin's complaint with prejudice and barring Triffin from entering evidence in defense of Continental Bank's counterclaim. On October 27, 1988, the Pennsylvania Superior Court affirmed those sanctions. *Triffin v. Con-*

*tinental Bank,* 386 *Pa.Super.* 660, 555 *A.*2d 947 (1988), *appeal denied,* 524 *Pa.* 610, 569 *A.*2d 1369 (1989).

Neither Triffin nor his counsel, Henry Janssen, appeared at the trial held on November 1, 1989. Janssen told the court that Triffin had instructed him not to appear in court on his behalf. Janssen remained counsel of record because Triffin did not sign the motion papers required for Janssen's withdrawal. Triffin claims that Janssen would not withdraw until he was paid. The trial proceeded, and Continental Bank presented its evidence. The Pennsylvania Court of Common Pleas determined that Triffin was involved in a check-kiting scheme with Wexler between December 1984 and March 21, 1985. *See Triffin v. Continental Bank,* No. 5509, slip op. at 3 (Pa.C.P. June 18, 1990). The court then entered judgment:

AND NOW, this 1st day of November, 1989 after trial this Court finds that the defendant Robert J. Triffin committed *actual fraud* against Continental Bank and Continental Bank suffered the loss of $74,648.08 plus the loss of use of its funds summing $25,283.93 for a total loss of $99,932.00 and JUDGMENT is hereby entered in favor of Continental Bank and against Robert J. Triffin a/k/a Joseph E. Murri and General Funding and General Funding Leasing Division in the amount of $99,932.00 plus costs.

[*Id.* (emphasis added).]

Triffin then filed a motion to strike the judgment, contending that he did not have notice of the ex parte trial in violation of the Due Process Clause of the Fourteenth Amendment. That motion was denied because the record demonstrated that (1) both Janssen and Triffin were given notice of the trial and (2) Triffin instructed Janssen not to appear and failed to appear himself. Moreover, the court explained that even if Triffin had been present at trial, he could not have presented a defense because he had been sanctioned by the court for failing to appear for depositions. The trial court's judgment was affirmed on appeal by the Pennsylvania Superior Court. *See Triffin v. Continental Bank,* 412 *Pa.Super.* 657, 594 *A.*2d 790, *appeal denied,* 529 *Pa.* 636, 600 *A.*2d 955 (1991).

Despite claiming to understand that the RG 303 Panel would not retry *Continental Bank,* Triffin insisted on attempting to prove that he did not commit civil fraud. Also, before this Court, Triffin

asserts that he was the victim of a reverse check-kiting scheme orchestrated by Wexler and Triffin's former bookkeeper Thelma Bart. To bolster that claim, he notes that he never received any of the money that Wexler and Bart took from the Continental account.

Triffin presents several contradictory excuses for his behavior relating to the *Continental Bank* litigation. Before this Court, he claims that he failed to cooperate during pre-trial discovery because his mother, who has supported him since 1986, refused to loan him the money to return from Nebraska, where he was attending law school, to attend the depositions. In his Pennsylvania Bar application, however, he claimed that he was unwilling to skip classes to attend the depositions. With respect to his failure to attend the trial, he explains, in his brief to the Court, that he realized that Continental Bank had a valid UCC claim and "the practical course of action would be to return to the Philadelphia area upon completion of law school, and with money earned from the anticipated practice of law, to pay" the judgment he assumed Continental Bank would receive. In his Pennsylvania Bar application, however, he stated that he failed to attend trial because he had no notice of it.

## B.

### The Bankruptcy

On April 30, 1986, during the pendency of the litigation with Continental Bank, Triffin filed a Chapter 7 bankruptcy petition on behalf of General Funding. Triffin explained that as a result of the *Continental Bank* litigation, other banks ceased working with him and he was unable to finance General Funding or Great States. On July 1, 1986, the bankruptcy court dismissed the petition for failure to file the required financial schedules.

After the dismissal of the bankruptcy petition, Triffin apparently liquidated General Funding's remaining assets and abandoned his "offices to their landlord." He paid his personal car loan with

the proceeds and walked away from his remaining obligations. Because he was unable to repay a $20,000 loan to General Funding made in 1985 by his mother, he turned Great States over to her. According to Triffin, between the time he filed for bankruptcy and the first RG 303 hearing on November 22, 1994, he made no arrangements with his creditors to repay his debts because he had no income and no business. He also explained that after the business failed, he went to law school and focused exclusively on his studies. Since finishing law school, he has spent most of his time in litigation, attempting to be admitted to the Pennsylvania Bar. When confronted with the fact that his behavior suggested that he lacked a sense of responsibility or obligation toward people who had loaned him money, Triffin replied that he would be able to repay his creditors faster as a member of the bar making a decent salary, than by "working at a WaWa." He claims that he intended to repay everyone in full once he had the money. He further claims that Continental Bank refused to allow him to pay the judgment from the anticipated proceeds of a pending legal malpractice claim he initiated against Janssen.

## C.

### Pennsylvania Bar Proceedings

During the pendency of the *Continental Bank* litigation, Triffin began law school. He graduated from Nebraska College of Law in June 1990 and applied to sit for the July 1990 bar examinations in New Jersey and Pennsylvania. He then elected not to sit for the July 1990 New Jersey Bar Examination.

On June 25, 1990, the Pennsylvania Board of Bar Examiners (Pennsylvania Board) refused to allow Triffin to sit for the examination because his application failed to establish the "[a]bsence of prior conduct by the applicant which in the opinion of the Board indicates character and general disqualifications ... incompatible with the standards expected to be observed by members of the bar...." Specifically, the Pennsylvania Board was concerned with incidents relating to Triffin's bankruptcy. Triffin then re-

quested a hearing before the Pennsylvania Board, which was scheduled for December 14, 1990. That hearing was postponed for several months because Triffin requested a stay pending the results of a federal lawsuit he filed against a number of people, including his former attorney Janssen, all seven justices of the Pennsylvania Supreme Court, and the members of the Pennsylvania Board. Among other things, Triffin sought declaratory and injunctive relief against the justices of the Pennsylvania Supreme Court and the members of the Pennsylvania Board arising from the denial of his bar application. Specifically, he claimed that Pennsylvania Bar Association Rules 203(3) and 213(b) violate substantive and procedural due process. In May 1991, the district court denied Triffin's motion for a preliminary injunction. *Triffin v. Pettit,* No. 90–7882, 1991 WL 78288 (E.D.Pa. May 7, 1991).

On June 19, 1991, the Pennsylvania Board held a hearing to determine Triffin's fitness to practice law. The hearing was continued over five subsequent sessions. On March 13, 1992, the Pennsylvania Board unanimously voted to deny Triffin's bar application. The Pennsylvania Board found the following misconduct by Triffin: "(1) making false statements, including omissions; (2) acts involving dishonesty, fraud, deceit or misrepresentation; (3) abuse of legal process; (4) violation of orders of court; and (5) neglect of financial responsibility." The Pennsylvania Supreme Court denied Triffin's Petition for Allocatur and Review of the Pennsylvania Board's decision.

Triffin reapplied for admission on March 17, 1993. In a letter dated March 23, 1993, the Pennsylvania Board rejected his second application and informed him of his right to appeal the Board's decision to the Pennsylvania Supreme Court. Rather than pursue that option, Triffin brought an action in federal district court challenging, among other things, the rules, customs, and practices of the Pennsylvania Board of Law Examiners and Disciplinary Board relating to consideration of persons reapplying for admission to the bar. On April 25, 1994, Triffin's complaint was dismissed with prejudice as to all defendants. *Triffin v. Nix.,* No.

93–5519, 1994 WL 156695 (E.D.Pa. Apr. 26, 1994), *aff'd* 43 *F.*3d 1463 (3d Cir.1994).

## D.

### Thatcher Hearing

Since Triffin's law school graduation, he has continued to purchase collection accounts at a discount and bring suit in his own name to recover the amount of the debt. Between September and November 1990, thirteen accounts were assigned to Triffin by his mother, trading as Great States. His mother has operated Great States from 1986 to the present. One of the assignments was Great States's claim against Original Thatcher's West Chester, Inc. (Original Thatcher's). On March 18, 1991, a hearing was held in the lawsuit Triffin brought on that claim. Defense counsel contested Triffin's status as a bona fide purchaser. Triffin called his mother to the stand to validate the assignment. In response to one of his questions, she testified that there were no other agreements between Great States and Triffin. Triffin failed to advise the court that in fact there were at least a dozen other assignments and that she was his mother.

## E.

### DiSalvo Suit

In April 1993, Triffin sued Albert DiSalvo, the president of A & M Check Cashing (A & M), and others on a chose in action purchased from United Jersey Bank (UJB). *See Triffin v. DiSalvo,* 434 *Pa.Super.* 326, 643 *A.*2d 118, 119 & n. 1 (1994), *appeal denied,* 541 *Pa.* 627, 661 *A.*2d 874 (1995). Defendants filed a motion requesting that Triffin be disqualified from participating in the action in any capacity. They claimed Triffin's case relied on confidential information that was obtained from A & M's files when he held himself out as an attorney and agreed to represent A & M in the matter against UJB. The trial court dismissed the action with prejudice. On appeal, the Pennsylvania Superior

Court affirmed, stating that "[h]ere, Triffin held himself out as an attorney when he met with A & M." *Id.* 643 *A.*2d at 120. Further, the court found that "[t]here is simply no manner in which Triffin can proceed in this action without using the confidential information he obtained by establishing an attorney-client relationship with A & M." *Id.* 643 *A.*2d at 121. Triffin did not initially disclose the *DiSalvo* case to the RG 303 Panel.

### F.

### Financial Responsibility

For the most part, the small amount of work Triffin has done in the liquidation business since graduating law school has resulted in no income. Since filing his bankruptcy petition, Triffin has been supported by his mother and more recently by his fiancee. At the RG 303 Hearing, Triffin's mother testified that since 1986 she had lent him approximately $300,000 for his living expenses, education, litigations, and for the purchase of collection accounts. Triffin has entered into a secured lending agreement with his mother, requiring that her ongoing loans to him be paid prior to payments to his other creditors. He admits that he has considered obtaining some other type of employment, but prefers to stay in the liquidating business because he enjoys the contact with professionals; also, he would otherwise not have time to pursue his federal litigation. Between November 1991 and March 1992, Triffin was an independent contractor working on a *per diem* basis for a number of attorneys who shared office space in Philadelphia. At the March 9, 1995 RG 303 Hearing, he stated that since October 1994 he has been responding to ads for paralegals in the Sunday Philadelphia Inquirer. At that hearing, Triffin further stated that he had not filed a tax return since 1984.

### G.

### New Jersey Bar Proceedings

Between 1990 and 1993, Triffin sat several times for the New Jersey Bar Examination. He passed in July 1993. At the request

of a reviewing attorney, RG 303 hearings were held on three separate dates. Triffin appeared *pro se* at each hearing. Twenty-five witnesses and seven affidavits of good character were presented.

The businessmen testifying on Triffin's behalf were associated with companies from which Triffin had purchased collection cases or were bankers. Most became acquainted with him in the early 1980s. In some cases their relationship with Triffin was ongoing; in others, it had terminated in the ten years prior to the RG 303 Hearing. They all testified that he was honest, truthful, and reliable. Some mentioned that if Triffin were admitted to the bar they would hire him.

Thirteen attorneys testified before the RG 303 Panel. The majority testified that Triffin was honest, truthful, trustworthy, reliable, and professional in his dealings with them. They also stated that Triffin was always clear that he represented himself *pro se* and was not a member of the bar.

Some of the attorneys, however, raised questions about Triffin's character. Although agreeing on further questioning that Triffin never claimed to be an attorney and represented himself *pro se,* Robert R. Kasmar, a member of the New Jersey Bar, initially stated that Triffin was an attorney at law, licensed in the State of New Jersey. Kasmar was under the impression that the hearing concerned an ethical complaint. He testified that Triffin was trustworthy, reliable, and committed to the judicial process.

Hal B. Eisenstein, a member of both the New Jersey and Pennsylvania Bars, had met Triffin just once and had spoken to him by phone a couple of times. When asked his opinion of Triffin's truthfulness, Eisenstein stated: "That's a little bit touchy, because in the transmittal I got with the subpoenas I received to come here today, it was indicated that I had agreed to be here, and I never even discussed it." Eisenstein further testified that based on the bankruptcy matter in which they were both involved, "[his] opinion of [Triffin's] procedural manner there is relatively high, because he was doing the best in his interest at the time, he

didn't break any rules or do had [sic] anything unethical at that time."

Geoffrey B. Gompers, an attorney licensed in Ohio, Pennsylvania, and New Jersey, claimed that he personally witnessed Triffin represent himself as an attorney at a meeting of the Check Cashing Association of Pennsylvania during the summer of 1992. He also provided hearsay testimony that his clients, the DiSalvos, had been told by Triffin that he was an attorney. Gompers testified that in dealing with Triffin on the *DiSalvo* matter, Triffin failed to provide timely notice of depositions, and had stated that because he was not an attorney he did not need to play by rules that attorneys follow. During the course of Gompers's testimony, Triffin stated: "I have no further questions for this *creature*." (emphasis added).

John R. Poeta, a member of the New Jersey Bar, testified that he had contact with Triffin while representing banks on two separate occasions on matters involving bad checks. He gave a qualified "yes" in response to a question concerning Triffin's honesty, because he felt that Triffin had reneged on a settlement after being given access to Poeta's client. Finally, Laura Proske O'Hara, a member of the New Jersey and Pennsylvania Bars who works for Chemical Bank, testified that Triffin had threatened that "he would buy up every piece of Chemical Bank paper on the street, and he would sue us forever" if she did not induce the bank to sell him bad paper. On one particular matter, he suggested that "because [she] had been nice to him, he would waive the interest if [she] would agree to appear ... [at the RG 303 Hearing] on his behalf."

## H.

### RG 303 Panel Recommendations

The RG 303 Panel unanimously recommended that certification of Triffin for admission to the bar be withheld. The Panel explained that the findings by the Pennsylvania courts in the

*Continental Bank* and *DiSalvo* cases of civil fraud, unauthorized practice, and behavior violating the professional conduct expected of an attorney "demonstrate a fundamental lack of the integrity and trustworthiness expected of a prospective attorney." The Panel rejected Triffin's contention that it should not credit the findings in those cases because he had been denied due process. Moreover, the Panel noted that regardless of the findings of the *Continental Bank* court, Triffin's refusal to participate in pre-trial discovery and failure to be represented at trial demonstrate "a disturbing lack of character."

The Panel was particularly troubled by the testimony of the four attorneys who felt that Triffin had acted dishonestly and unprofessionally in his dealings with them. Specifically, the Panel focused on the statement by Poeta that Triffin had reneged on a settlement after gaining access to Poeta's client, and the testimony by O'Hara that Triffin "attempted to use threats or bribes in order to obtain business and favorable testimony." The Panel concluded that such conduct was a violation of professional ethics.

Although recognizing that prior conduct that demonstrates a lack of fitness to be admitted may be overcome by a showing of rehabilitation, the Panel found that Triffin had failed to present even a "scintilla of evidence of rehabilitation." Following the report of the RG 303 Panel, Triffin requested and received a RG 304 Review Hearing. The RG 304 Panel reviewed the Report and Recommendation of the RG 303 Panel, the transcripts of the hearings before the RG 303 Panel, exhibits that included Triffin's original Certified Statement with attachments and a later six volume submission, and his brief. After reviewing Triffin's assignments of errors to the RG 303 Report and Recommendation, as well as his argument that he had not been afforded due process, the RG 304 Panel unanimously determined that the evidence substantiated the findings of the RG 303 Panel. The RG 304 Panel noted that at its hearing Triffin had "presented no additional evidence as to rehabilitation and remorse except for the presentation of his participation in Sons of Italy and his assertion that if

he were admitted to practice he would participate in *pro bono* work."

## II

The New Jersey Constitution provides that the Court has jurisdiction over admission to the practice of law. *N.J. Const.* art. VI, § 2, ¶ 3. "[T]he Court has inherent jurisdiction to review any determination concerning an applicant's fitness to practice law . . . [and] retains the authority in all cases to make the final determination of an applicant's fitness to practice law." *Application of Matthews*, 94 *N.J.* 59, 74, 462 *A.*2d 165 (1983).

Bar membership in New Jersey is a privilege burdened with conditions. *See id.* at 75, 462 *A.*2d 165. "Among the most basic conditions precedent to bar admission are 'good moral character, a capacity for fidelity to the interests of clients, and for fairness and candor in dealing with the courts.'" *Ibid.* (quoting *In re Pennica*, 36 *N.J.* 401, 433, 177 *A.*2d 721 (1962)). In *Matthews, supra*, the Court first articulated the "substantive standards governing individual fitness to practice law" in New Jersey. *Ibid.* Those standards continue to be followed. *See Application of McLaughlin*, 144 *N.J.* 133, 675 *A.*2d 1101 (1996). The *Matthews* Court explained that the fitness requirement must be considered "in relation to the state's interests in the regulation of the legal profession. These interests are generally recognized to be two-fold: first, the protection of prospective clients, and second, the assurance of the proper, orderly and efficient administration of justice." *Matthews, supra*, 94 *N.J.* at 76–77, 462 *A.*2d 165.

The *Matthews* Court concluded that "a bar applicant must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice." *Id.* at 77, 462 *A.*2d 165. The Court further concluded that "applicants must demonstrate through the possession of such qualities of character the ability to adhere to the Disciplinary Rules governing the conduct of attorneys." *Ibid.*

## III

■ We now examine whether and to what extent Triffin's conduct demonstrates a present unfitness to practice law. We are satisfied that unless evidence of unfitness is clear and convincing "any lingering doubts as to the ability of the candidate to undertake the professional responsibility of a lawyer can be resolved in his or her favor and admission to the bar should be allowed." *Matthews, supra,* 94 *N.J.* at 78, 462 *A.*2d 165.

■ Applying the *Matthews* standard to Triffin, we find that he is currently unfit to practice law. We find no merit in Triffin's assertion that the *Continental Bank* judgment is unconstitutional. Under New Jersey law, a judgment properly entered in another jurisdiction is entitled to full faith and credit provided the judgment does not violate the Due Process Clause. Triffin was not denied due process. Triffin was given an opportunity to be heard and he declined the opportunity by failing to appear and by directing his attorney not to appear. Moreover, Triffin's due process argument was pursued by him to the highest levels of the Pennsylvania court system, and was rejected.

The court's finding of actual fraud in *Continental Bank* demonstrates that he lacks the qualities of honesty and truthfulness that are necessary to become a bar member. *See Matthews, supra,* 94 *N.J.* at 81, 462 *A.*2d 165 (relying on proposition that involvement in fraud can be considered in determining that applicant lacks "the character traits of honesty and truthfulness, trustworthiness and reliability, and of an ability to fully conform to the Disciplinary Rules governing the professional and ethical conduct of attorneys").

We also find little merit in Triffin's argument that the *DiSalvo* decision should not be given full faith and credit. Pennsylvania has proper jurisdiction over its own procedural requirements. The Pennsylvania Superior Court rejected Triffin's procedural argument, and the Pennsylvania Supreme Court denied Triffin's appeal. The *DiSalvo* court's finding that Triffin obtained privi-

leged information while holding himself out as the DiSalvos' attorney, and then used that information to the DiSalvos' detriment, demonstrates a violation of *RPC* 1.6 (confidentiality of information), *RPC* 1.7 (conflict of interest: general rule), *RPC* 1.9 (conflict of interest: former client), and *RPC* 8.4(c) (misconduct: conduct involving dishonesty, fraud, deceit, or misrepresentation). In sum, Triffin has failed to demonstrate his ability to adhere to the rules governing the conduct of attorneys in New Jersey.

Even discounting the findings in *Continental Bank* and *DiSalvo*, clear and convincing evidence exists that Triffin is presently unfit to practice law in New Jersey. There is much evidence indicating that Triffin has long lacked respect for the judicial process. During the course of the *Continental Bank* litigation, he was sanctioned by the court for repeatedly failing to comply with the pre-trial discovery orders. By disregarding that order, Triffin violated *RPC* 3.5(c) (engaging in conduct intended to disrupt a tribunal) and *RPC* 8.4(d) (engaging in conduct that is prejudicial to the administration of justice). Although Triffin has expressed remorse for his failure to comply with the court's orders, his failure to comply with the orders evinces a lack of respect toward the tribunal and the judicial process. Also, he refused to sign the necessary documents to allow his attorney to withdraw from the case, even after he had fired him. In addition, he failed to provide the court with his new address and purposefully failed to attend trial.

Moreover, some of Triffin's witnesses at the RG 303 Hearing raised important questions about his character, particularly, John R. Poeta, who felt that Triffin had reneged on a settlement agreement after being given access to Poeta's client, and Laura Proske O'Hara, who testified that Triffin threatened to sue Chemical Bank to force it to give him business. Despite the positive testimony of other attorneys and business associates, his more recent actions with regard to Poeta and O'Hara suggest that he still lacks respect for the judicial process and the administration of justice.

His rude comment to Gompers during the RG 303 Hearing, "I have no further questions for this creature," does not reach the level of disgraceful behavior toward the Committee on Character and other court personnel displayed by McLaughlin. *See McLaughlin, supra,* 144 *N.J.* 133, 675 *A.*2d 1101. Nonetheless, when viewed in the context of his other behavior, Triffin's comment evidences a lack of respect toward the courts.

Because Triffin provided the Committee with *extensive* records of the many lawsuits in which he has been involved, his failure initially to reveal the *DiSalvo* findings to the Committee on Character does not reach the level of Jenkins's lack of candor with the Committee. *See Application of Jenkins,* 94 *N.J.* 458, 467 *A.*2d 1084 (1983). Given the extensive documentation Triffin provided with his application, however, his initial failure to reveal the *DiSalvo* findings indicates a lack of respect for the hearing process and for the judicial process in general. Finally, Triffin's failure to tell the *Original Thatcher's* court that his witness was his mother and to correct any misimpression by the court, as a result of a misstatement by her, also indicate his lack of respect for the administration of justice.

Triffin's failure to demonstrate any financial responsibility also supports a finding of present unfitness to practice law. Triffin appears to have learned from the *Continental Bank* litigation that he should never give anyone presigned checks on his account, and he has not done so since 1985. He has, however, made no effort to repay his creditors, including his mother to whom he owes over $300,000, from the time he unsuccessfully filed for bankruptcy in 1986. Despite Triffin's assurances that he plans to repay his mother and other creditors once he is admitted to the bar, his actions indicate that he is unwilling to assume responsibility for his own support or for his debts. It is not a disqualification that Triffin cannot pay his debts. It is that he seems not even to care that he owes these debts. Rather than support himself, Triffin has chosen to spend years filing fruitless lawsuits in order to gain admittance to the Pennsylvania Bar.

As the *Matthews* Court explained, the fitness requirement must be considered "in relation to the state's interest in ... the protection of prospective clients." 94 *N.J.* at 76–77, 462 *A.*2d 165. A financially irresponsible person should not be placed in a position where he might make decisions detrimental to the financial well-being of his clients.

## IV

Because the Court is interested in an applicant's present fitness to practice law, evidence of reform and rehabilitation is relevant to an assessment of the applicant's moral character. *Matthews, supra,* 94 *N.J.* at 81, 462 *A.*2d 165. "Where evidence convincingly demonstrates reform and rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct and, if persuasive, present fitness may be found." *Ibid.* However, "in the case of extremely damning past misconduct, a showing of rehabilitation may be *virtually impossible* to make." *Id.* at 81–82, 462 *A.*2d 165 (emphasis added). "In certain instances, evidence of a positive kind including affirmative acts demonstrating personal reform and improvement will be required in order to establish the requisite degree of rehabilitation." *Id.* at 81, 462 *A.*2d 165 (citation omitted). The following types of evidence are probative of reform and rehabilitation: (1) an applicant's complete candor in filings and proceedings conducted by the Committee on Character; (2) an applicant's renunciation of his or her past misconduct; (3) the absence of misconduct over a period of intervening years; (4) "a particularly productive use of [the applicant's] time subsequent to the misconduct"; and (5) "[a]ffirmative recommendations from people aware of the applicant's misconduct who specifically consider the individual's fitness in light of that behavior." *Id.* at 82, 462 *A.*2d 165.

Applying the *Matthews* standard, we find that the evidence clearly and convincingly demonstrates that Triffin is presently unfit to practice law. There has been no showing of rehabilitation. There is nothing in the record to suggest that Triffin will be more

financially responsible in the future than in the past. He has made no attempt to pay his creditors. Mere assurances by Triffin that he intends to participate in *pro bono* work and to repay his debts once admitted to the bar cannot overcome the adverse inference of unfitness that must be drawn from his misconduct. There is no renunciation of his past misconduct, except for his acknowledgment that he should have obeyed the court's order in the *Continental Bank* case. He has presented no evidence of *pro bono* work; his membership in the Sons of Italy does not suffice.

Based on our independent review of the record, we find, as did the RG 303 Panel, that Triffin has failed to produce even a "scintilla of evidence" of rehabilitation. Specifically, Triffin failed to produce evidence of "candor before the committee, absence of any intervening misconduct, renunciation of past misdeeds, and productive use of [his] time including commitment to the community at large."

We do not know whether Triffin will ever be rehabilitated. Even if Triffin can present evidence of affirmative acts in the future, he may not be able to overcome the adverse inferences of unfitness that must be drawn from his past acts. In *Matthews,* the Court found Matthews presently unfit to practice law, even after he made restitution to the victims of his "Ponzi" scheme and received positive reviews from attorneys in the law office where he was working. *Matthews, supra,* 94 *N.J.* at 83–84, 462 *A.*2d 165. Nonetheless, we are hesitant to foreclose the possibility that at some future time Triffin may be able to produce sufficient evidence of the character traits necessary to establish his fitness to practice law. *Jenkins, supra,* 94 *N.J.* at 470, 467 *A.*2d 1084. Such evidence, we suggest, should demonstrate at least that he has become self-supporting, has implemented a plan for repayment of his creditors, and has become involved in community service/volunteer activities. Moreover, he must demonstrate that "when placed in a position of responsibility, he can act honestly and truthfully and with trustworthiness and reliability in his dealing with others." *Matthews, supra,* 94 *N.J.* at 83, 462 *A.*2d 165.

Accordingly, we adopt the Committee's recommendation and direct that certification of the candidate's character and fitness be withheld without prejudice to the candidate's right to present to the Committee, no earlier than three years from the filing date of this opinion, evidence of rehabilitation in accordance with *Matthews, supra*, 94 *N.J.* 59, 462 *A.*2d 165, and this decision.

So ordered.

*For withholding*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.